THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
JOSEPH M. BERGIN, Defendant-Appellant.

Second District   No. 2—90—0802

Opinion filed March 30, 1992.

Philip C. Parenti and Jeffrey J. LeVine, both of Philip C. Parenti, Ltd., of Chicago, for appellant.

James E. Ryan, State's Attorney, of Wheaton (William L. Browers, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE INGLIS delivered the opinion of the court:

A single parent of four young children was suddenly awakened in her bed at 4 a.m. on Sunday, September 3, 1989. Two men were in her dark bedroom, one standing right at her bedside. The closest man, whom the victim recognized as a 24-year-old next-door neighbor, covered her face with a pillow and allegedly said "[d]on't talk or we'll kill the kids." Both men then left.

Following a jury trial in May 1990, defendant, Joseph M. Bergin, was convicted of unlawful restraint (Ill. Rev. Stat. 1989, ch. 38, par. 10—3) and intimidation (Ill. Rev. Stat. 1989, ch. 38, par. 12—6) for the above acts. The jury acquitted defendant on a charge of home invasion, and the trial court entered a directed verdict for defendant on a charge of residential burglary. Defendant was sentenced to concurrent terms of 30 months' probation with six months' periodic imprisonment, which was stayed pending this appeal. Defendant made a timely appeal and argues that the convictions should be reversed for four reasons: (1) because defendant's motion to exclude certain photographs was improperly denied; (2) because three jury instructions tendered by defendant were improperly denied; (3) because the prosecutor made improper comments during closing argument; and (4) because defendant was not proven guilty beyond a reasonable doubt. We affirm.

### TRIAL TESTIMONY

Fifteen witnesses testified, and stipulations from two police officers were entered into the record during the four-day trial. We will not dwell on facts ascertained at trial that are not in dispute. Defendant admits drinking with friends at various Elmhurst, Illinois, establishments on Saturday, September 2, 1989, from 9 p.m. until closing time at around 4 a.m. Defendant then returned to his parents' home, where he lived, with his friend Harry Gordon, who was visiting from Minnesota for the weekend. Defendant admits entering the victim's home, directly adjacent to his parents' home, through a basement door, climbing two flights of stairs to reach the victim's second-floor bedroom, standing at her bedside while Gordon was elsewhere in the room, placing a pillow over her face, asking her to roll over on her side, and then running out of the house with Gordon. In dispute is whether defendant threatened the victim when she awoke by telling her "Don't talk or we'll kill the kids," which the victim alleges but defendant denies. Defendant's theory of the case at trial and on ap-

peal is that he was merely trying to extract his drunken friend, who had unknowingly entered the wrong home, from the victim's home. Defendant and his family and the victim and her family have been next-door neighbors for over 10 years.

The victim testified that she awoke at 4 a.m. to find defendant standing by her bedside. She asked him twice what he was doing there to which he did not reply. She then screamed. Defendant moved closer to her, and she reached up and grabbed his arms. Defendant then placed a pillow on her face and threatened in a raspy voice "Don't talk or we'll kill the kids." She found it hard to breathe with the pillow on her face and said "I can't breathe." Defendant repeated the previous threat, and the victim again complained about breathing, asking defendant to "[p]lease let me sit up." Defendant told her to roll over onto her side, at which time she saw another man standing in the bedroom doorway. Throughout the ordeal, she noticed a "bar odor" about the defendant. Both men then ran out of her bedroom and out of her home, after which she immediately called the Elmhurst police department.

When the police arrived, the victim realized that she had a bloody scratch on her nose from the encounter with defendant. A photograph of her face, showing the scratch and which was taken at the time, was introduced into evidence. The police found the victim's bed to be a mess and also found what was later identified as defendant's black L.A. Raiders hat on the victim's bed near the pillow area. The hat and photographs of the bed were introduced into evidence. Shortly after the police arrived, the victim identified the other intruder, Harry Gordon, whom the police had standing outside in her driveway. She did not recall that Gordon had ever been near her bed. On cross-examination, she testified that the incident had been very emotionally upsetting to her. In response to a question regarding her degree of alertness when she suddenly awoke that particular morning, she said that with four young children, she typically wakes up and responds quickly to their needs at night. The victim stated that she was not taken to the hospital for the scratch on her nose.

The prosecution called seven law enforcement witnesses. Officer Robert Wanderer of the Elmhurst police department testified that he was the first officer to arrive at the victim's home, at approximately 4:20 a.m. He met the victim at the front door and noticed the scratch on the victim's nose. He did not, however, take any skin or blood samples from defendant's fingernails to verify the implication that defendant had inflicted the scratch. Officer Wanderer noticed that the basement screen door latch on the victim's home had recently been

broken. He found recent tracks in the victim's backyard and footprints in defendant's backyard; however, he did not request to see defendant's shoe for a match. Wanderer found the black L.A. Raiders hat on the victim's bed, which was later used by a police bloodhound for tracking purposes. He described the scene of the crime as being two suburban homes with side-by-side blacktop driveways, separated by a narrow grassy strip. The victim's home is directly south of defendant's parents' home.

Officer Michael Lullo of the Elmhurst police department talked with the victim shortly after police responded to the call. The victim told Lullo that her 24-year-old neighbor, defendant, had been one of the two men in her bedroom and that he was the one who placed a pillow over her face. Lullo testified that he saw the other man, Harry Gordon, that morning at approximately 5:45 a.m. and opined that Gordon was not under the influence of alcohol at that time.

Officer Dennis Kazarian of the Elmhurst police department also responded to the call. He stated that the victim was very emotionally upset and that the victim had a cut on her nose. Kazarian stated that around 6 a.m. that morning he went to defendant's home next door and found defendant and Gordon sleeping in the basement. He asked Gordon to step outside onto the victim's driveway, at which time the victim identified Gordon as one of the two intruders in her bedroom.

Deputy Sheriff Dennis Guzlas of the Du Page County sheriff's department testified that he arrived at 5:45 a.m. that morning with a bloodhound tracking dog. Guzlas stated that he had six years of experience as a dog handler and that the dog he had with him that morning had a 90% success rate. The dog traced a scent from the L.A. Raiders hat. Guzlas placed the dog at the rear kitchen door of the victim's home, where the intruders had apparently departed. The dog travelled through a few backyards, around the block, and finished the search at the front door of defendant's home. The prosecution introduced into evidence a copy of the map that Guzlas had made showing the path of the dog through the neighborhood.

Two stipulations were offered by the prosecution concerning tests performed on the L.A. Raiders hat. Elmhurst police officer Don Pasquerella stated that he packaged the hat and submitted it to the Du Page County crime laboratory, along with hair samples from defendant and Gordon that were taken pursuant to a court order. Alfred Lucas, a forensic chemist with the crime laboratory, stated that after testing he found that the hair in the hat was similar to hair samples submitted by defendant and not similar to those submitted by Gordon.

Sergeant Thomas Turek of the Elmhurst police department testified that he arrived 15 minutes after the call, at approximately 4:30 a.m. Turek talked with defendant at defendant's home shortly thereafter, at which time defendant denied going onto the victim's property hours earlier. The defendant told Turek that he and Gordon came home from a night of socializing with friends, parked in the driveway for approximately 10 minutes and then went to bed. Defendant did ask Turek "[d]id the guy steal anything?"

During the course of the prosecution's case, the prosecutor introduced a variety of color photographs of the area around the two homes. The prosecutor also introduced a map of the area around the two homes, drawn by Officer Pasquerella, into evidence.

John Bergin, defendant's older brother, testified that he and his girlfriend had been out socializing with defendant and Gordon that evening and early morning. He opined that Gordon appeared drunk. He stated that he was parked in the street in front of his parents' home with his girlfriend when defendant and Gordon arrived and parked their cars in the driveway. While he did not recall what defendant or Gordon did upon their arrival, he did state that he and his girlfriend heard a scream from the victim's home about five minutes after defendant and Gordon arrived home.

Bernard Elsner, defendant's employer at the time, testified that he is president of Illinois School Services, where defendant was a salesman in training at the time. The two had a business meeting planned for Sunday, September 3, 1989. Elsner stated that defendant called sometime that day and cancelled the meeting because there had been a death in the family. The two did meet the following day, at which time defendant told Elsner what had actually happened. At that time, defendant told Elsner that his drunken friend had mistakenly entered the wrong home, that he tried to retrieve his friend and that they woke the victim up in the process.

Defendant's case consisted of testimony from six individuals, plus his own testimony. Kurt Zackrison testified that he has known defendant and Harry Gordon since eighth grade. He stated that he was socializing with both friends for part of the evening on the night of September 2, 1989. He opined that while Gordon was intoxicated that evening, defendant was not.

Maria Guadalupe Carmona testified that defendant's mother babysat her child from 1987 through 1989. She stated that she occasionally saw defendant playing with her child and the victim's children.

Jeff Borla testified that he has known defendant and Gordon for 15 years and that he was socializing with the two and other friends

on the evening of September 2, 1989. Borla opined that while Gordon was intoxicated on the evening in question, defendant was not.

Defendant presented three character witnesses who testified as to defendant's good reputation in the community. Two football coaches from the College of Du Page, where defendant had played for two years, and an assistant State's Attorney for Cook County testified on defendant's behalf.

Defendant was the last witness. He testified that after a night of socializing with friends, Harry Gordon followed him home, both parking their cars in the driveway at about 4 a.m. Defendant told Gordon to wait by a fence while he went behind the house to urinate. When defendant came back, Gordon was gone. Defendant stated that he then looked through a kitchen window in the victim's home and saw Gordon inside. He found the back door to the victim's home locked and no windows which were open. He entered the victim's home through an open basement door, kicking some stacked cans as he walked in. Defendant ran up the stairs to the first floor, heard footsteps above him on the second floor, and ran up to the second floor in search of Gordon. He stated that he saw Gordon standing in the victim's bedroom and that Gordon was snoring. He tried to grab Gordon to remove him, bumped the victim's bed, and fell onto the victim's bed while she was sleeping. The victim awoke and screamed. Defendant put a pillow over her face so that she would not be able to recognize him. She said that she could not breathe, so he removed the pillow and told her to roll onto her side. Defendant then grabbed Gordon and exited the victim's home through the rear kitchen door. He stated that he was nervous about what had just happened and ran around the block, cut through a yard and jumped a fence to get back to his next-door house because he did not want the victim to see him. When he got to the back door of his house he grabbed Gordon, who was standing there, and went to the basement to sleep.

Defendant testified that he was then awakened at approximately 5:30 a.m. that morning by the police. He denied that he was involved in the incident when he spoke with police at that time. Later that morning, he received a telephone call from the Elmhurst police department and drove down to the station for further questioning at about 9:30 a.m., after which he was placed under arrest. When asked by Officers Lullo and Turek at the police station if he had entered the victim's home earlier that morning, he shrugged his shoulders. Defendant denied saying "[d]on't talk or we'll kill the kids" when he was in the victim's bedroom. He stated that he knew the victim as a neighbor and occasionally played with her children. He also denied

calling his employer, Bernard Elsner, that morning and saying that he would not be able to make their scheduled meeting because there had been a death in the family.

Defendant testified that Harry Gordon was a good friend of his and his family for many years and that Gordon had probably been in his home hundreds of times. Defendant stated that the second-floor attic in their home is where he and his brothers used to sleep. He opined that Gordon might have thought that the attic was where he was supposed to sleep, which could explain Gordon's venturing up to the second floor of the victim's house. Defendant's present bedroom is in the basement of his parents' home. Defendant stated that while the victim's house has an exposed, outside basement stairway, his parent's house does not.

## PHOTOGRAPHS

At issue is whether reversible error arose when the trial court denied defendant's motion to exclude a group of color photographs of the two houses that were first tendered to the defense on the last day of trial. Defendant claims that the State violated Supreme Court Rule 412 pertaining to discovery which provides in pertinent part:

> "[T]he State shall, upon written motion of defense counsel, disclose to defense counsel the following material and information within its possession or control:
>
> * * *
>
> (v) any *** photographs *** which the prosecuting attorney intends to use in the hearing or trial." 134 Ill. 2d R. 412.

Defendant correctly notes that the photographs were an attempt by the State to rebut defendant's assertion made during the trial that the houses would appear similar to a drunk at 4 a.m., as Gordon allegedly was, and that Gordon had merely confused the houses and mistakenly entered the victim's. Defendant claims that the photographs surprised and prejudiced the defense and therefore their introduction was reversible error. We disagree.

■■ We note that while defendant did object to the photographs, he did not seek a continuance so as to allow him time to study the photographs and refute any prejudicial inferences presented. In fact, the following colloquy took place between the trial judge and defense counsel immediately after the trial court denied defense counsel's objection to the photographs:

> "MR. PARENTI [defense counsel]: My motion to exclude the new evidence is denied?

THE COURT: Do you need some time before proceeding with your case here to look at those, and if you have any further preparation?

MR. PARENTI: I have reviewed them, your Honor."

This court has previously stated that "[e]xclusion of evidence is a last resort, required only where a recess or a continuance would be ineffective. [Citation.] Generally the failure to seek a continuance waives a claim of error based upon a discovery violation." (*People v. Curtis* (1986), 141 Ill. App. 3d 827, 833; see *People v. Lucas* (1986), 140 Ill. App. 3d 1, 12-13.) We conclude that defendant waived his claim of error by not requesting a continuance. Moreover, we agree with the State that defendant suffered no prejudice by the introduction of the photographs. We have examined the photographs at issue and conclude that they were consistent with other evidence of the scene of the crime and that the defense was not taken by surprise.

■ Within his argument section regarding the photographs, defendant also raised another discovery issue. Defendant alludes to an allegedly undisclosed statement of the defendant which was first elicited during redirect examination of Officer Lullo. To the extent that defendant has raised this issue for review in his brief, we conclude that defendant has waived appellate review of the alleged error by not including the claim in his written post-trial motion. *People v. Enoch* (1988), 122 Ill. 2d 176, 186-90; Ill. Rev. Stat. 1989, ch. 38, par. 116—1(c).

### JURY INSTRUCTIONS

Defendant argues that the trial court erred by denying four of his tendered jury instructions: a non-Illinois Pattern Jury Instruction regarding a missing witness (Harry Gordon); an instruction on the affirmative defense of necessity (Illinois Pattern Jury Instructions, Criminal, No. 24—25.22 (2d ed. 1981) (hereinafter IPI Criminal 2d)); and two non-IPI instructions on unlawful restraint (based on IPI Criminal 2d Nos. 8.06 and 8.07).

We initially note the general rule that a defendant is entitled to instructions on those defenses which the evidence supports, even where the support is slight. (*People v. Everette* (1990), 141 Ill. 2d 147, 156.) The Supreme Court has stated that "[a]s a general proposition, a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." (*Mathews v. United States* (1988), 485 U.S. 58, 63, 99 L. Ed. 2d 54, 61, 108 S. Ct. 883, 887.) Our supreme court in *Everette* cautioned that while " 'very slight evidence upon a given theory of a

case will justify the giving of an instruction,' *** we must be wary so as not to permit a defendant to demand unlimited instructions based upon the merest factual reference or witness' comment." (*Everette*, 141 Ill. 2d at 157, quoting *People v. Bratcher* (1976), 63 Ill. 2d 534, 541.) Whether to give a non-IPI instruction to the jury is a decision committed to the trial court's sound discretion. (*People v. Thompkins* (1988), 121 Ill. 2d 401, 441; see 134 Ill. 2d R. 451(a).) Any error in giving or refusing instructions will not justify a reversal when the evidence in support of the conviction is so clear and convincing that the jury's verdict would not have been different. (*People v. Austin* (1989), 133 Ill. 2d 118, 124; see *People v. Moore* (1983), 95 Ill. 2d 404, 410 (harmless error standard applied to alleged jury instruction error).) We analyze each disputed jury instruction in light of the above principles.

Defendant first argues that the trial court committed reversible error in denying the non-IPI missing witness instruction he tendered. The instruction would have informed the jury that it was peculiarly within the power of the State to produce Harry Gordon as a witness and that it could infer from the State's failure to call him that Gordon would have testified unfavorably to the State's case. The instruction is based on Seventh Circuit Committee (1980) Instruction 3.25.

As his primary source of authority, defendant cites *United States v. Mahone* (7th Cir. 1976), 537 F.2d 922, where the court affirmed a trial court's decision to deny a missing witness instruction. Under *Mahone*, a two-part test exists for the court to grant a missing witness instruction: (1) the absent witness must be peculiarly within one party's power to produce; and (2) the testimony of the witness must elucidate issues in the case. *Mahone*, 537 F.2d at 926-27.

■ Defendant has a weak argument on either part of the test. We find no evidence in the record that Harry Gordon was within the peculiar control of the State, notwithstanding defense counsel's allegations. Furthermore, we fail to see how Gordon would illuminate facts of the case concerning defendant's convictions of intimidation and unlawful restraint. According to defendant's own testimony, he found Gordon snoring in a standing position in the victim's bedroom. Given the uncertainty of whether Gordon's testimony would have been useful, we cannot say the trial judge abused his discretion by not giving the missing witness instruction. The conclusion we reach is in fact similar to the conclusion reached in *Mahone*: that "[i]n cases such as this where it is debatable whether the absent witness' testimony would have elucidated the issues in the case, there should be latitude for the judge to decide whether the requested instruction would be

unnecessary and time consuming for the jury." (*Mahone*, 537 F.2d at 927.) We find no error in the trial court's denial of defendant's missing witness instruction.

Defendant next contends that reversible error arose from the trial court's refusal of his tendered jury instruction on the defense of necessity, which states:

"Conduct which would otherwise be an offense is justifiable by reason of necessity if the defendant was without blame in occasioning or developing the situation and reasonably believed that such conduct was necessary to avoid a public or private injury greater than the injury which might reasonably result from his own conduct." (IPI Criminal 2d No. 24—25.22.)

Defendant argues in his brief that the evidence showed "that he *entered the victim's home* solely to rescue Gordon, believed to be intoxicated, and to protect the victim and her children from Gordon," and that he was without blame in developing the situation.

■ We fail to understand how a defense of necessity relates to defendant's convictions of intimidation and unlawful restraint. Defendant's necessity defense, according to his own argument, relates only to his *entry* into the victim's home. The defense of necessity in no way relates to threatening the victim or holding a pillow to her face. Furthermore, the only offenses charged which concerned the defendant's entry of the victim's home were residential burglary, of which defendant received a directed verdict, and home invasion, for which defendant was acquitted. We agree with the State that alleged errors in instructions are not subject to attack on appeal where the defendant has been acquitted of the offenses to which the instructions pertain. (See *People v. Schneider* (1939), 370 Ill. 612, 616-17; *People v. Legear* (1975), 29 Ill. App. 3d 884, 893.) We find no error in the trial court's refusal of defendant's necessity instruction.

Defendant next argues that the trial court erred in denying the following non-IPI instructions on unlawful restraint:

Defendant's Tendered Instruction No. 19:

"A person commits unlawful restraint when he knowingly and without authority detains another.

To commit unlawful restraint, the defendant must detain his victim with an overriding intent and motivation to detain.

Further, the conduct must prevent the person from moving from one place to another, and said conduct must be directly related to the detention." (Based on IPI Criminal 2d No. 8.06.)

Defendant's Tendered Instruction No. 21:

"To sustain the charge of unlawful restraint, the State must prove the following proposition:

First: That the defendant JOSEPH BERGIN knowingly and without legal authority detained [victim] with an overriding intent and motivation to detain her.

Second: That JOSEPH BERGIN'S conduct prevented [victim] from moving from one place to another.

If you find from your consideration of the evidence that this proposition has been proved beyond a reasonable doubt, you may find the defendant guilty.

If you find from your consideration of all the evidence that this proposition has not been proved beyond a reasonable doubt, you should find the defendant JOSEPH BERGIN not guilty." (Based on IPI Criminal 2d No. 8.07.)

■■ At the outset, we find these two instructions to be non-IPI instructions because they depart substantially from the equivalent IPI versions. Defendant based his formulation of the two instructions on the holdings in *People v. Haybron* (1987), 153 Ill. App. 3d 906, and *People v. Kuykendall* (1982), 108 Ill. App. 3d 708. Based on the two cases, defendant argues that without his tendered instructions, the jury was erroneously allowed to convict him of unlawful restraint even if his overriding intent and motivation was not the detention of the victim, but only the avoidance of detection, of which his detention of the victim was only derivative and circumstantially related.

In both *Haybron* and *Kuykendall*, the court reversed a conviction of unlawful restraint because of insufficient proof. In *Kuykendall*, the court discussed how certain offenses against the person or property necessarily involve a degree of restraint. (*Kuykendall*, 108 Ill. App. 3d at 710.) The court noted that in such cases as rape, murder and robbery, "the overriding intent and motivation of the offender" is something other than unlawful restraint. (*Kuykendall*, 108 Ill. App. 3d at 710.) The latter quoted language is the language defendant included in his tendered instructions. This court has previously criticized that particular language from *Kuykendall* for focusing on defendant's motive, rather than his knowledge, and we do so again here. (*People v. Paulick* (1988), 174 Ill. App. 3d 868, 871.) The court in *Haybron* merely repeated the "overriding intent and motivation" language, citing *Kuykendall*, and reversed for insufficient proof. *Haybron*, 153 Ill. App. 3d at 908.

Our research shows no other unlawful restraint case in Illinois that has invoked the "overriding intent and motivation" language of

*Kuykendall.* In fact, recent cases interpreting *Kuykendall* have interpreted it as holding that unlawful restraint is punishable as a separate crime, in cases where a greater offense such as rape or armed robbery is also charged, if the restraint is independent. See *People v. Leonhardt* (1988), 173 Ill. App. 3d 314, 322; *People v. Watts* (1988), 170 Ill. App. 3d 815, 826; *People v. Sperow* (1988), 170 Ill. App. 3d 800, 814.

To the extent that *Kuykendall* and *Haybron* stand for the proposition that an offender's motive is the key factor in an unlawful restraint charge, we disagree and choose not to follow them. We believe the better analysis is to follow the plain language of section 10—3(a) of the Criminal Code of 1961 under which an offender must *"knowingly* without legal authority" detain another. (Emphasis added.) (Ill. Rev. Stat. 1989, ch. 38, par. 10—3(a); see IPI Criminal 2d No. 8.06.) We find no error in the trial court's denial of defendant's non-IPI unlawful restraint jury instructions.

PROSECUTOR'S COMMENTS

At issue is whether the trial court erred in denying defendant's motion for a mistrial. Defendant made the motion in response to a comment by the prosecutor during rebuttal closing argument that there were two defendants in this matter although only one was now on trial. Defendant argues that throughout the trial he never mentioned that Gordon was a defendant and that the prosecutor's comment implied that Gordon was not being tried because he had pled guilty, from which the jury would infer that defendant, too, must be guilty. Defendant concludes that he is entitled to a new trial. We disagree.

The following exchange took place during the prosecutor's rebuttal closing argument:

"MR. BIRKETT [prosecutor]: He [defendant] had a job, he was making good dough. And so did Harry.

Ladies and gentlemen, these comments about mother and father, everybody loves Harry, they will continue to love him— Joe, not Harry, my partner just corrected me. Maybe everybody loves Harry, too. There are two defendants in this case, but only one on trial now.

MR. PARENTI [defense counsel]: Excuse me?

MR. BIRKETT: Maybe everybody does love Joe.

MR. PARENTI: Objection. May I have a sidebar?

THE COURT: I will sustain the objection, the jury will disregard the statement with regard to more than one defendant.

MR. BIRKETT: I'm sorry if I misspoke. I mean, Joe. Maybe everybody loves Joe. They will not stop loving him and caring for him if you do your job and find him guilty, the world will not stop. They will continue to love him. And don't be persuaded by sympathy and prejudice."

This court has held that "a prosecutor is given wide latitude in closing argument as long as the comments are based on the evidence or reasonable inferences therefrom." (*People v. Cobb* (1989), 186 Ill. App. 3d 898, 916; see *People v. Thompkins* (1988), 121 Ill. 2d 401, 445.) Generally, a prosecutor's remarks in closing argument do not amount to reversible error unless they constitute a material factor in defendant's conviction or result in substantial prejudice to him. (*Thompkins*, 121 Ill. 2d at 445.) Furthermore, prompt instructions by the trial judge to the jury to disregard improper closing argument comments will usually cure any error. (*People v. Franklin* (1990), 135 Ill. 2d 78, 100.) We will analyze defendant's contentions of prejudicial error in light of the above principles.

■ We initially disagree with defendant's premise that there is no basis in the record for a closing argument comment by the prosecutor implying that Harry Gordon was also charged in the case. In cross-examining both Officer Lullo and Officer Turek, defense counsel asked questions which themselves implied that there had been such a case. We thus conclude that there was evidentiary support for the prosecutor's inadvertent comment.

Furthermore, defendant neglects to mention in his argument that his objection to the comment was sustained. The trial judge promptly instructed the jury to disregard the comment. In addition, the jury here received the customary instructions both before and after the testimony and arguments that it should disregard comments of counsel which are not based on evidence. We believe the prompt action here by the trial judge cured the allegedly improper prosecutorial comment.

Cases cited by defendant do not alter our conclusion. In *People v. Thomas* (1975), 25 Ill. App. 3d 88, the court found that the prosecutor's improper comments did not rise to the level of reversible error in view of the strong evidence of defendant's guilt. (*Thomas*, 25 Ill. App. 3d at 92.) Such a result could also stand in the instant case given the strong evidence supporting defendant's convictions. In *People v. Weinstein* (1966), 35 Ill. 2d 467, which defendant also cites, the court found reversible error based on repeated improper comments by the prosecutor. (*Weinstein*, 35 Ill. 2d at 471.) *Weinstein* therefore does not apply in this case where the prosecutor made one inadvertent comment, which was promptly corrected by the trial judge.

GUILT BEYOND A REASONABLE DOUBT

As the final issue raised, defendant argues that he was not proven guilty beyond a reasonable doubt of either unlawful restraint (Ill. Rev. Stat. 1989, ch. 38, par. 10—3) or intimidation (Ill. Rev. Stat. 1989, ch. 38, par. 12—6).

Our supreme court discussed the parameters of appellate review of a claim of reasonable doubt in *People v. Boclair* (1989), 129 Ill. 2d 458:

"It is the jury's duty to assess the credibility of witnesses and to weigh the evidence in determining a defendant's guilt or innocence. [Citations.] That determination is entitled to great deference, and when the sufficiency of the evidence is challenged we will not retry the defendant, although it is our duty to set aside a conviction when the evidence raises a reasonable doubt of defendant's guilt. \*\*\* ' "[T]he relevant question is whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' " (Emphasis in original.) *Boclair*, 129 Ill. 2d at 474, quoting *People v. Collins* (1985), 106 Ill. 2d 237, 261, quoting *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789.

Regarding his unlawful restraint conviction, defendant argues that the State failed to show that his overriding intent and motivation was to detain the victim, citing *People v. Haybron* (1987), 153 Ill. App. 3d 906, and *People v. Kuykendall* (1982), 108 Ill. App. 3d 708, as authority. Defendant argues that the State merely showed that the minimal detention caused by defendant's holding a pillow to the victim's face was derivative of his purpose to avoid identification.

■ Defendant confuses the issue at hand and misconstrues the unlawful restraint statute, which simply states:

"A person commits the offense of unlawful restraint when he *knowingly* without legal authority detains another." (Emphasis added.) (Ill. Rev. Stat. 1989, ch. 38, par. 10—3(a).)

While defendant's argument focuses on his motive or lack thereof to unlawfully restrain the victim, the key word in the statute is "knowingly," about which we see no real debate when applied to the evidence. Furthermore, as stated earlier in the opinion, we disagree with *Kuykendall* and *Haybron* to the extent that they suggest that this court should focus on the motive of the defendant. (See *Paulick*, 174 Ill. App. 3d at 871.) Lastly, we strongly disagree with defendant's attempt to minimize the import of his placing a pillow over the face of a single woman suddenly awakened in her own bedroom. The victim had a right to suffer no

restraint at all. See *People v. Satterthwaite* (1979), 72 Ill. App. 3d 483, 485 (two-minute impairment of victim's freedom of locomotion constituted unlawful restraint).

Defendant next challenges the sufficiency of the evidence as to his intimidation conviction for telling the victim: "Don't talk or we'll kill the kids." Defendant argues that the evidence was insufficient to show that he personally uttered the threat, since the victim had a pillow over her face at the time the threat was uttered and since, as a long-time friend of the family, defendant was unlikely to have threatened the victim's children. We disagree.

Contrary to defendant's argument, the intent which must be proven by the State is not the intent to carry out the threat but the intent to "cause another *** to omit the performance of any act" (Ill. Rev. Stat. 1989, ch. 38, par. 12—6), which in this case was talking. We therefore agree with the State that the proof of intimidation is not undercut by the unlikelihood that defendant would have harmed the victim's children due to his good relationship with the children.

The issue here is therefore one of credibility: whom the jury chose to believe. Defendant denied having uttered the threat while the victim claimed he had. Resolution of that question was within the unique province of the jury as trier of fact. (*Boclair*, 129 Ill. 2d at 474.) And the jury had reason to reject defendant's testimony. The jury heard testimony, some from defendant himself, of false statements by defendant to both the police and his former employer following the offense. We find defendant's speculation that Harry Gordon uttered the threat to be exactly that, speculation. There is no evidence in the record to support such speculation.

The jury in the instant case heard testimony from 17 witnesses over the course of the four-day trial, acquitted defendant on a charge of home invasion, and found him guilty beyond a reasonable doubt of unlawful restraint and intimidation. After our review of the record, we cannot say that the jury's verdict is so unsatisfactory, unreasonable or improbable as to raise a reasonable doubt of defendant's guilt on either conviction.

The judgment of the circuit court of Du Page County is affirmed.

Affirmed.

WOODWARD and BOWMAN, JJ., concur.