2021 IL App (1st) 201154-U

FIFTH DIVISION
October 29, 2021

No. 1-20-1154

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of Cook County. |
| | ) | |
| v. | ) | 14 CR 08078 |
| | ) | |
| JOSEPH GOODWIN, | ) | Honorable Timothy Joyce, |
| | ) | Judge Presiding. |
| Defendant-Appellant. | ) | |

JUSTICE CONNORS delivered the judgment of the court.
Presiding Justice Delort and Justice Cunningham concurred in the judgment.

**ORDER**

*Held:* A rational trier of fact could have found defendant guilty of unlawful restraint beyond a reasonable doubt; and defendant did not receive ineffective assistance of counsel. Affirmed.

¶ 1 Defendant, Joseph Goodwin, appeals from an order by the trial court after a remand that was ordered from this court. Following a jury trial, defendant was convicted of threatening a public official and unlawful restraint. The trial court merged the unlawful restraint count into the threatening a public official count, and sentenced defendant to 2 ½ years' imprisonment. On appeal, we reversed defendant's conviction for threatening a public official. *People v. Goodwin*,

2018 IL App (1st) 152045. We did not adjudicate defendant's challenge to the unlawful restraint conviction because the trial court had not imposed a sentence on that count. *Id.* ¶ 63. We remanded the case so the trial court could sentence defendant on the unlawful restraint count. *Id.* ¶ 65. On remand, the trial court imposed a 2 ½ year sentence on the unlawful restraint count, time considered served. Defendant now appeals, arguing that the State failed to prove him guilty of unlawful restraint beyond a reasonable doubt, or alternatively, that he received ineffective assistance of counsel. For the following reasons, we affirm.

¶ 2                                  I. BACKGROUND

¶ 3      Defendant was charged with threatening a public official, intimidation, and unlawful restraint following an incident on the fourth floor of the Richard J. Daley Center (Daley Center) on March 19, 2014. The public official named in the indictment was Assistant State's Attorney (ASA) Nora Gill. The details of the jury trial are described in *Goodwin*, 2018 IL App (1st) 152045, and thus we will only highlight those facts necessary to this appeal. The jury found defendant guilty of threatening a public official and unlawful restraint, and not guilty of intimidation.

¶ 4      Gill testified at trial that she had been an ASA for eight years and that on the date in question she was assigned to traffic court in courtroom 402 of the Daley Center. She was four-and-a-half months pregnant at the time. Gill's law clerk, Allison Kudzy, was assisting her that day. At about 9:30 a.m., Gill spoke with another attorney, who told her he needed to get to federal court. He asked Gill if she could tell the judge that he had been there, that his client, Alfredo Montes, was represented, and request another court date. At about 9:45 a.m., Judge Dan Gallagher entered the courtroom and called Montes's case first. Montes and Gill approached the bench, and Gill told the judge that Montes had an attorney who needed to be in federal court at

10 a.m. and had requested another court date. In response, the judge "yelled" at Gill, "How dare you let attorneys leave, I wanted this case called." Gill stated that the judge gave the case a very short date and "threw some papers and stormed off the bench and yelled at me to get my shit together."

¶ 5    Gill testified that Montes seemed confused, so she told him to follow her to an office down the hall to call his attorney. She and Montes then turned towards the back of the courtroom and walked down the aisle towards the double doors. Gill testified that a man, whom she identified as defendant, approached her, and was laughing and pointing his finger at her, saying "oh, you made the judge mad; ha, ha, you made the judge mad." Gill responded, "between the two of us you are here on bond, so why don't you find a seat." Defendant then "got really loud and really angry, and he started putting his finger in my face and said, come back here and say that to my face, get back here and say that to my face." Gill stated that she proceeded to walk out the door with Montes, and that defendant "sort of edged *** Montes out and squeezed though the door with me at the exact same time, so that he was like right in my face."

¶ 6    Gill further testified that on the way to the satellite office, which was about 40 feet from courtroom 402, defendant followed her and stayed right next to her. She "tried to move to the left closer to the wall, and he came right with me, just right in my face. The whole time he was just screaming louder and louder; fuck you bitch, come back here and say that to my face, you can't talk to me, fuck you bitch, just screaming just right in my face." Gill indicated that defendant was about six to eight inches from her face, and she felt scared. When she attempted to enter the satellite office, she reached for the door handle and defendant "turned like right in front of the door, like right in front of me so I [could not] get into the door." Gill stated that she could not get into her office at this point because defendant's body was blocking the door. She further stated:

"Montes was right behind us. He had been next to me, and the defendant squeezed him out. He reached through. The defendant reached with his hand like he was going to go for the handle, but [Montes] put his arm in and he pushed on the handle and he pushed open the door and I was able to get through between the wall and [Montes]. [Montes] moved in between us."

¶ 7 Gill testified that she and Montes went into the office, and that ASA Debra Chessick was inside. Gill sat down in a chair that was not visible from the door because she did not want defendant to be able to see her. Gill called Montes's attorney while defendant was "[r]ight outside the door." Gill could see his hair and could hear him talking but could not understand what he was saying. After speaking to Montes's attorney, Gill told Montes he could leave. When Montes opened the door, she could hear defendant say, "come out here and talk to me, come out here and talk to me you bitch." Two other law clerks entered the office while defendant was standing at the door.

¶ 8 Gill stated that defendant was standing outside her office for three or four minutes and "it felt like a really long time." Gill was "really scared that [defendant] was going to do something. She did not feel free to leave the office, stating, "There was no way I could have gotten out of the office door. He was right there, and the whole time he was still yelling." Gill said she did not try to leave because defendant "was right in the door and he was screaming; come out here, come out here you bitch, fuck you bitch."

¶ 9 There were two law clerks in the office with Gill, one of whom went to get the sheriff who was assigned to courtroom 402. Shortly thereafter, the sheriff came to the office and defendant left.

¶ 10    Montes testified that on the date in question, Gill told the judge that Montes's lawyer had to go to federal court, and the judge "got really upset and started yelling at the state's attorney and gave me a continuation date." Gill told him she would call his lawyer and asked Montes to follow her to one of the offices in the hallway. When they got out to the hallway, there was a man who was about 5 feet, 9 inches tall, weighing 140 or 150 pounds, with dark skin, and dreadlocks. The man said to Gill, "[Y]ou shouldn't have said that," and then started yelling and following Gill towards the office. Montes testified that when they got to the office, the man "was standing right with his side part of his body blocking for her to get in. So when I walked to the door, I got in between them and I opened the door to allow [Gill] to get in," and then followed her in.

¶ 11    Montes stated that Gill was very upset and had "watery eyes." While he was in the office, he could see the man with the dreadlocks standing outside the office door "at least for a good five minutes." After Gill called his attorney, Montes left the office.

¶ 12    On cross-examination, Montes testified that he did not hear the man with dreadlocks call Gill a bitch, did not hear him say "fuck you, bitch," and did not hear the man threaten any physical harm to Gill.

¶ 13    ASA Debra Chessick testified that on the date in question, she was working in the traffic courtrooms on the fourth floor of the Daley Center. At around 10 a.m., she was on the phone in the small satellite office when she heard some commotion, including "loud noises, maybe some yelling." Chessick stated that when the door to the office was closed, a person could not hear exactly what was going on outside the door. Gill and two men then started entering the office. Gill was on the right, Montes was in the middle, and defendant was on the left. Montes "kind of had his arm stretched out to be a barrier in between the defendant and [Gill]." His hand was

either on the glass or on the handle of the door to allow [Gill] access to the room." Defendant remained outside the door pacing back and forth. Gill was "very upset" and looked as if she was about to cry.

¶ 14     ASA Chessick testified that she stepped one or two feet out of the office and told defendant to get away and that he had to get out of there. Chessick stated that defendant stepped back about seven feet but was still visible from the office. He was still loud and demanded that Chessick give him Gill's name and her information. Defendant had his cell phone in his hand and said he was talking to his lawyer. Chessick "[did not] feel safe. I [did not] know what he was going to do next, and I wished that there had been a sheriff that was close by to make him step away to get further away from our office." Eventually, a sheriff's deputy came over to speak to defendant.

¶ 15     On cross-examination, Chessick testified that she did not hear defendant say, "fuck you bitch" She did not hear defendant threaten Gill with words but stated that "the way his body was when she was coming into the room was threatening."

¶ 16     Deputy Joe Glover of the Cook County Sheriff's Department testified that on the date in question he was assigned to courtrooms 402 and 404 of the Daley Center. While he was in the hallway, a law clerk approached him, who was frantic, and told him "There was some guy yelling and screaming at [Gill]." Deputy Glover called the security supervisor to report the disturbance and then went with the law clerk. Defendant was on his phone, about six feet from the door of the satellite office. He instructed defendant to step back into courtroom 402 to wait for his case to be called. After his case was called, Deputy Glover and another security officer took defendant into custody.

¶ 17     The State rested.

6

¶ 18    Defendant testified that on the date in question, he was on the fourth floor of the Daley Center to pay a fine for a traffic matter. The judge became upset with Gill, raised his voice, and threw some papers down before calling a recess and going to the courtroom next door. Defendant stated that he was talking to another woman in the back of the courtroom, who said it seemed like the deputy was trying to lock up Montes. Defendant responded, "yeah, wow, that [assistant state's attorney] really pissed the judge off." Gill was coming out of the courtroom at the same time, and interrupted the conversation by saying, "well, don't worry about who is getting locked up today, you worry about yourself getting locked [up.]"

¶ 19    Defendant stated that as he asked Gill if she was threatening him, he pulled out his cell phone and called his attorney. He took Gill's words as a threat because he had not appeared before the judge yet, and "she say[s] she is not a person that can have [me locked up]. But look at what [I am] going through now. Off her word I was arrested that day." Defendant testified that he then went down the hallway to retreat to the bathroom to have a private conversation with his attorney to find out why the assistant state's attorney "was saying she is going to lock me up or I could be locked up."

¶ 20    Defendant testified that as he was walking to the bathroom, Gill was about three steps behind him. He saw her go into the state's attorney's satellite office, which he described as being "pretty much adjacent to the men's bathroom." Defendant stated that he was about seven or eight feet from the door when he was looking in. He denied ever trying to touch the door of the office and stated that Montes "never even came near me."

¶ 21    Defendant further testified that, eventually, someone came out of the office and got the deputy, who approached defendant and told him to step back into the courtroom when he finished his phone call. Defendant testified that when he went back into the courtroom, he asked

the clerk for the name of the female state's attorney that was previously before the judge in that courtroom, but the clerk did not know her name. Defendant stated that when his case was finally called, he was told to sit in the front because one of the assistant state's attorneys stated that defendant was to be "locked up today." Thereafter, defendant was arrested. He denied ever saying, "fuck you" to Gill, denied ever calling her a bitch, and denied ever trying to touch her. He also denied putting his hands in Gill's face and threatening her.

¶ 22    On cross-examination, defendant testified that the men's bathroom was "down the hall" from the satellite office.

¶ 23    Investigator Leann Goshen from the Cook County Sheriff's Department testified that on March 19, 2014, she was called to the Daley Center to investigate an incident involving a threat to a public official. She took notes during her interviews and ultimately prepared a report. When asked if during the interview Gill ever told her that defendant said, "come out here and talk to me bitch," Goshen responded, "In my notes I didn't write that because things are in summary. It's not verbatim." Goshen further testified that she did not write that defendant said, "Fuck you, bitch" in her report. The report did not state that defendant tried to grab the handle of the office door but did state that defendant had blocked the doorway. Goshen testified that her report only stated that defendant was making gestures but did not state that he pointed a finger in Gill's face. Goshen testified that she interviewed Montes, but her report did not mention Montes pushing defendant. When interviewing Chessick, Chessick never told her that defendant attempted to enter the satellite office.

¶ 24    On cross-examination, Goshen read a portion of her report that indicated defendant followed Gill to her office yelling, pointing his finger in her face, and blocked the doorway not

letting Gill into her office. Goshen stated that she never asked Gill what exact words defendant yelled at her.

¶ 25    In rebuttal, the State called law clerk Bobby Cannatello, who testified that on the date in question, he was assigned to courtroom 408 at the Daley Center. At approximately 9:45 a.m., he left the courtroom to go to the satellite office down the hall. While he was walking down the hall, he saw defendant about one foot from the satellite door. Defendant was yelling, "This is fucking bullshit, come out of the office. I want your fucking name, bitch."

¶ 26    Cannatello entered the office, where he observed Gill, Chessick, and "a Latino gentleman." Gill was "teary-eyed," and was crying. Cannatello asked if there was anything he could do, such as get the deputy sheriff, but he remained in the office because he "felt uncomfortable leaving [Gill] and [Chessick] alone." He could hear defendant in the hallway screaming, "Come out of the office you fucking bitch, give me your fucking name, this is bullshit."  The sheriff arrived soon after.

¶ 27    On cross-examination, Cannatello testified that defendant never spoke to him, and he could not recall whether defendant was on the phone during the occurrence. Cannatello spoke to Goshen approximately two or three hours after the occurrence. Cannatello stated that he told Goshen what defendant had said but did not know if Goshen wrote it down.

¶ 28    The defense then recalled Goshen in rebuttal, who stated that she spoke with Cannatello after the incident and took notes during their conversation. She recalled him saying that defendant was yelling but could not recall what the exact words were.

¶ 29    The jury found defendant guilty of threatening a public official and unlawful restraint. The trial court merged the unlawful restraint count into the threatening a public official count for sentencing. The court sentenced defendant to two-and-a-half years in prison for threatening a

public official. The trial court denied defendant's motion to reconsider sentence and defendant appealed.

¶ 30    On direct appeal, defendant argued in part that the State failed to prove him guilty beyond a reasonable doubt of both threatening a public official and unlawful restraint. *Goodwin*, 2018 IL App (1st)152045, ¶ 31. We granted defendant relief on his first claim, ruling that the evidence adduced against defendant did not prove that he committed the offense of threatening a public official because his words did not constitute a true threat of violence. *Id*. We did not address defendant's argument regarding unlawful restraint because defendant had not been sentenced on the unlawful restraint count, and thus there was no "final judgment." *Id*. ¶ 58. We remanded the case to the circuit court to impose a sentence on that count. *Id*. ¶ 63.

¶ 31    On remand, the trial court sentenced defendant to two-and-a-half years' imprisonment for unlawful restraint, with time considered served. The court denied defendant's motion for a new trial. Defendant now appeals.

¶ 32                                II. ANALYSIS

¶ 33    On appeal, defendant claims that the State failed to prove him guilty of unlawful restraint beyond a reasonable doubt, or alternatively, that trial counsel was ineffective for failing to request adequate jury instructions.

¶ 34                            A. Unlawful Restraint

¶ 35    When reviewing a challenge to the sufficiency of the evidence, the appropriate standard of review is whether viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense were proven beyond a reasonable doubt. *People v. Nesbit*, 398 Ill. App. 3d 200, 208 (2010). Decisions regarding the credibility of witnesses and the weight give to their testimony are exclusively within the province

of the jury. *Id*. at 209. A defendant's criminal conviction will be reversed only where the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of defendant's guilt. *Id.*

¶ 36    "[A] person commits the offense of unlawful restraint when he or she knowingly without legal authority detains another." 720 ILCS 5/10-3(a) (West 2016). "The key concern for unlawful restraint is whether a person was detained, that is, whether that person's 'freedom of locomotion was *** impaired.' " *People v. Daniel*, 2014 IL App (1st) 121171, ¶ 50 (quoting *People v. Satterthwaite*, 72 Ill. App. 3d 483, 485 (1979)). "Neither physical force nor the presence of a weapon is required. *Id*. Stated another way, "The gist of unlawful restraint is the detention of a person by some conduct which prevents him from moving from one place to another." *People v. Bowen*, 241 Ill. App. 3d 608, 627-28 (1993). "[T]he duration of the restraint, however short, is inconsequential." *People v. Jones*, 93 Ill. App. 3d 475, 479 (1981) (conviction for unlawful restraint affirmed where victim was restrained for "a few seconds"). See also *Satterthwaitte*, 72 Ill. App. 3d at 485 (conviction for unlawful restraint affirmed where victim's freedom of movement was only impaired for approximately two minutes).

¶ 37    In the case at bar, Gill testified that defendant squeezed through the courtroom door with her while she tried to exit the courtroom and followed her to the satellite office. When she attempted to enter her office, she reached for the door handle but defendant "turned like right in front of the door, like right in front of me so I [could not] get into the door." Gill stated that she could not get into the office because defendant's body was blocking the door. Montes then moved between them and pushed open the door so that Gill was able to get through to the office between the wall and Montes.

¶ 38    Montes corroborated Gill's testimony by stating that when they got to the satellite office, defendant "was standing right with his side part of his body blocking for her to get in. So when I walked to the door, I got between them and I opened the door to allow [Gill] to get in."

¶ 39    ASA Chessick testified that when Gill entered the office, she saw Montes with his arm "stretched out to be a barrier in between the defendant and [Gill.] His hand was either on the glass or on the handle of the door to allow [Gill] access to the room." Cook County Sheriff's Investigator Leann Goshen read an excerpt from her report that defendant "blocked the doorway of ASA Gill's office, not letting Gill enter her office."

¶ 40    We find when viewing this evidence in a light most favorable to the prosecution, that a rational trier of fact could have found the elements of unlawful restraint were proven beyond a reasonable doubt. *Nesbit*, 398 Ill. App. 3d at 208. Gill's freedom of locomotion was impaired when she tried to enter the satellite office and defendant blocked her access to the satellite office with his body. See *Daniel*, 2014 IL App (1st) 121171, ¶ 50 (the key concern for unlawful restraint is whether a person was detained, meaning whether the person's freedom of locomotion was impaired).

¶ 41    Defendant argues that because we found in his prior appeal that the "evidence creates a reasonable inference that [defendant] was attempting to obtain Gill's name so he could file a complaint against her," we cannot find that he knowingly detained defendant. However, this inference that we made in assessing whether defendant was properly convicted of threatening a public official, has no bearing on our determination as to whether defendant knowingly detained Gill.

¶ 42    A person acts knowingly when he or she is consciously aware that such "result is practically certain to be caused by his conduct." 720 ILCS 5/4-5(b) (West 2016). Here, the

testimony established that defendant used his body to block Gill from entering the satellite office. Looking at the evidence in the light most favorable to the prosecution, a rational trier of fact could find that defendant knew his action of putting his body in front of the office door would impair Gill's freedom of locomotion. The fact that defendant may have had a different motive – of getting her name to file for a complaint – is simply irrelevant to whether he knowingly detained her in the process. See *People v. Bergin*, 227 Ill. App. 3d 32, 46 (1992) (while defendant argued that his intent was not to detain the victim when he put a pillow over her face, the court noted that defendant's argument mistakenly focused on his lack of motive to restrain the victim "when the key word in the statute is knowingly.")

¶ 43 Similarly, defendant's argument that his unlawful restraint conviction should be reversed outright because his words did not threaten Gill with violence is misplaced. While what he said to Gill was crucial to our analysis of the threatening a public official count, it has no bearing on whether defendant knowingly impaired Gill's locomotion.

¶ 44 Finally, defendant argues that he did not touch Gill, and therefore it was reasonable to infer that he would not have physically stopped her from entering the office if she had tried. However, actual or physical force is unnecessary to sustain an unlawful restraint conviction, so long as the victim's freedom of movement is impaired." See *People v. Lee*, 376 Ill. App. 3d 951, 958 (2007). Accordingly, we find that, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found defendant guilty of unlawful restraint because he used his body to block Gill's access to the satellite office on the date in question. Having found that there was sufficient evidence to find defendant guilty of unlawful restraint beyond a reasonable doubt based on his action of blocking the door to the satellite office, we need not address whether defendant's subsequent actions caused Gill to be unlawfully restrained

inside the office. See *People v. Sanchez*, 2013 IL App (2d) 120445, ¶ 27 (we may affirm on any ground supported by the record).

¶ 45                                   B. Ineffective Assistance of Counsel

¶ 46    To establish ineffective assistance of counsel, a defendant must show that counsel's performance was (1) deficient and (2) prejudicial. *Strickland v. Washington*, 466 U.S. 668 (1984); *People v. Ramsey*, 239 Ill. 2d 342, 433 (2010). Because we find that the words used by defendant were irrelevant in this case, and rather that it was the act of using his body to block Gill's access to the office that unlawfully detained Gill, it follows that defendant's contention that his counsel was ineffective for failing to request a jury instruction regarding freedom of speech is without merit. As noted above, defendant's action of blocking the door, not what he said, was the evidence that satisfied the unlawful restraint conviction. Accordingly, a jury instruction on freedom of speech would have had no bearing on the outcome of this case, and thus counsel's failure to request one could not be prejudicial. See *People v. Houston*, 229 Ill. 2d 1, 4 (2008) (to establish prejudice, the defendant must show that but for counsel's errors, there is a reasonable probability that the result of the proceedings would have been different). Failure to satisfy the prejudice prong of *Strickland* precludes a finding of ineffective assistance of counsel. *People v. Henderson*, 2013 IL 114040, ¶ 11.

¶ 47                                   III. CONCLUSION

¶ 48    For the foregoing reasons we affirm the judgment of the circuit court of Cook County.

¶ 49    Affirmed.