# Illinois Official Reports

## Appellate Court

---

### *People v. Goodwin*, 2018 IL App (1st) 152045

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOSEPH GOODWIN, Defendant-Appellant. |
| District & No. | First District, Sixth Division<br>Docket No. 1-15-2045 |
| Filed | September 21, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 14-CR-8078; the Hon. Joseph G. Kazmierski, Judge, presiding. |
| Judgment | Reversed and remanded with directions. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Sean Collins-Stapleton, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Brian K. Hodes, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE CONNORS delivered the judgment of the court, with opinion.<br>Justices Hoffman and Cunningham concurred in the judgment and opinion. |

**OPINION**

¶ 1        Defendant, Joseph Goodwin, was charged with threatening a public official, intimidation, and unlawful restraint after he yelled obscenities at an assistant state's attorney and followed her down the hall of the courthouse to her office. After a jury trial, defendant was convicted of threatening a public official and unlawful restraint. He was ultimately sentenced to two and a half years' imprisonment. Defendant appeals, arguing that (1) the State failed to prove him guilty of threatening a public official beyond a reasonable doubt because there was no evidence that he threatened the victim, (2) in the alternative, he was deprived of a fair trial due to ineffective assistance of counsel, (3) the threatening a public official statute is unconstitutional, and (4) the State failed to prove him guilty of unlawful restraint beyond a reasonable doubt. For the reasons that follow, we find that the State failed to prove defendant guilty beyond a reasonable doubt of threatening a public official and reverse his conviction. We also remand this matter to the circuit court to impose a sentence for defendant's unlawful restraint conviction.

¶ 2                                    I. BACKGROUND

¶ 3        A grand jury charged defendant with the following respectively-numbered counts: (I) threatening a public official (720 ILCS 5/12-9(a)(1) (West 2014)), (II) intimidation (*id.* § 12-6(a)(2)), and (III) unlawful restraint (*id.* § 10-3(a)). The indictment named Assistant State's Attorney Nora Gill as the public official at issue. The charges arose from an incident that occurred on the fourth floor of the Richard J. Daley Center (Daley Center) on March 19, 2014. Defendant's jury trial began on February 17, 2015, and ended on February 19, 2015, with the jury finding defendant guilty on counts I and III, and not guilty on count II.

¶ 4        After opening statements, the State called Gill to testify. Gill stated that she had been an assistant state's attorney for eight years and that, on March 19, 2014, she was assigned to traffic court in courtroom 402 of the Daley Center. On that date, Gill was four and a half months' pregnant. Gill testified that typically there are two assistant state's attorneys assigned to a courtroom, but on that date, her partner was on vacation and law clerk Allison Kudzy was assisting her. Gill described the court call on March 19, 2014, as "very, very heavy," and said the courtroom was "packed." Gill stated that the court call was supposed to start at 9 a.m., but that Judge Dan Gallagher did not get to courtroom 402 until about 9:40 or 9:45 a.m. Gill stated that while she was waiting for the judge to take the bench, she spoke to some of the present defense attorneys. Specifically, she spoke with attorney Patrick Boyle, who represented Alfredo Montes. Gill testified that around 9:30 a.m., Boyle told her that he needed to get to federal court. Boyle asked Gill to let the judge know that he had been there and that Montes was represented and to request another date. Gill stated that the judge took the bench and Montes's case was called first. Montes then approached the bench from the gallery and Gill informed the judge that Montes had an attorney who had to be in federal court at 10 a.m., and had asked that Gill put his name in the record and ask for a short date. In response, the judge "yelled" at Gill " '[H]ow dare you let attorneys leave, I wanted this case called.' " Gill stated that the judge gave the case a very short date and "threw some papers and stormed off the bench and yelled at me to get my shit together."

¶ 5        Gill testified that Montes was standing next to her at that point and looked confused. She thought Montes might think the judge was yelling at him, so she told Montes to come to her

office down the hall to call his attorney and let him know what happened. Gill stated that she and Montes then turned towards the back of the courtroom and walked down the aisle towards the double doors, only one of which opened. Gill further stated that a man, whom she identified as defendant, was standing by the door that did not open and "approached me and he was like laughing and kind of pointing his finger, oh, you made the judge mad; ha, ha, you made the judge mad." Gill testified that she responded, "between the two of us you are here on bond, so why don't you find a seat." As a result, defendant "got really loud and really angry, and he started putting his finger in my face and said, come back here and say that to my face, get back here and say that to my face." Gill further stated that she then went to walk out the door with Montes still to her right, and that defendant "sort of edged *** Montes out and squeezed through the door with me at the exact same time, so he was like right in my face." Gill testified that the small satellite office to which she took Montes was 40 feet from courtroom 402. Gill stated that the satellite office had a phone, a desk, a computer, and a couple of chairs.

¶ 6        Gill testified that on the way to the office, "[defendant] followed me. He stayed right here. I tried to move to the left closer to the wall, and he came right with me, just right in my face. The whole time he was just screaming louder and louder; fuck you bitch, come back here and say that to my face, you can't talk to me, fuck you bitch. Just screaming just right in my face." Gill indicated that defendant was about six to eight inches from her face. Gill stated that she felt scared and had not had a defendant do that to her in the previous four and a half years she had been assigned to traffic court. Gill testified that she did not say anything in response to defendant's yelling. Gill testified that when she attempted to enter her office, she reached for the door handle and defendant "turned like right in front of the door, like right in front of me so I [could not] get into the door." Gill stated that she could not get into her office at this point because defendant's body was blocking the door. When asked what happened next, Gill responded:

> "Montes was right behind us. He had been next to me, and the defendant squeezed him out. He reached through. The defendant reached with his hand like he was going to go for the handle, but [Montes] put his arm in and he pushed on the handle and he pushed open the door and I was able to get through between the wall and [Montes]. [Montes] moved in between us."

¶ 7        Gill testified that she and Montes then went into the office. Inside the office was Gill's coworker, Assistant State's Attorney Debra Chessick. Gill stated that once in the office, she sat down in a chair that was not visible from the door because she did not want defendant to be able to see her. Gill testified that Chessick was on the phone and she asked her to hang up so that she could call Montes's attorney. While Gill made the phone call, defendant was "[r]ight outside the glass door." Gill could see defendant's hair and could hear him talking, but could not hear what he was saying. After Gill spoke to Montes's attorney, Montes asked if he should stay or leave. Gill told him it was okay for him to go. Montes then opened the door to leave and shut the door behind him. Gill stated that when the door opened, she could hear defendant say "come out here and talk to me, come out here and talk to me you bitch." Gill stated that a law clerk named Bobby then came into the office, and a couple minutes later, law clerk Kudzy came in. Gill testified that defendant was standing outside the door to the office for three or four minutes and "[i]t felt like a really long time." Gill stated that at that point, she felt "really scared that [defendant] was going to do something." Gill further stated that she did not feel free to leave the office. Specifically, she stated, "There was no way I could have gotten out of the

office door. He was right there, and the whole time he was still yelling." Gill explained that she did not try to leave the office because "[defendant] was right in the door and he was screaming; come out here, come out here you bitch, fuck you bitch." Additionally, Gill stated that she tried to call her supervisor to tell her what had happened but she was "choked up" so Chessick took the phone and explained what happened. Gill stated that when law clerk Bobby came into the office, he stayed. Law clerk Kudzy, however, asked Gill if she was okay, and when Gill replied that she was not, Kudzy stated that she was going to get the sheriff who was assigned to courtroom 402. Shortly thereafter, the sheriff came to the office, and defendant left.

¶ 8    On cross examination, Gill stated that after the incident was over she had a "brief" conversation with Leann Goshen, an investigator from the sheriff's department, within one or two hours of the incident. When asked if she ever told Goshen that defendant had said "fuck you, bitch" to her, Gill stated that she told Goshen that defendant was screaming in her face, but that she did not recall if Goshen asked for the specific words defendant used. Gill admitted that defendant never verbally threatened her with bodily harm. Gill also stated that while defendant was standing outside her office, he was on the phone. She clarified that she did not see him on the phone, but that she "heard conversation where it seemed like he was talking on the phone." Gill denied that defendant was continuously asking for her name and denied that she ever threatened to have defendant locked up. On recross examination, Gill testified that she called Montes's attorney when she was in the office, and did not call anyone in the sheriff's department.

¶ 9    The State next called Montes, who testified that on March 19, 2014, he went to courtroom 402 of the Daley Center because he had a case pending in that courtroom. Montes stated that on that date he arrived at 9 a.m. and saw his attorney, Patrick Boyle, in courtroom 402. Montes stated that he and Boyle had a conversation and then Boyle left to go to federal court. Montes testified that Judge Gallagher did not take the bench in courtroom 402 until 9:40 or 9:45 a.m. When asked what happened when he stepped up in front of the judge, Montes stated that "[the] State's attorney told the judge that my lawyer had to go to federal court. [The judge] got really upset and started yelling at the state's attorney and gave me a continuation date. Then she was going to do me a favor and call my attorney to let him know when was my continuation date." Gill told Montes to follow her to one of the offices in the hallway so that she could call his attorney. Montes stated that when he stepped out into the hallway there was no one else in the hall, except Gill and a man who was about five feet, eight inches or five feet, nine inches tall, weighed about 140 or 150 pounds, and had dark skin and dreadlocks. Montes testified that he saw this man approach Gill, and heard her saying, " '[Y]ou shouldn't have said that,' in a polite way." Montes stated that the man then started yelling and following Gill towards the office, but that he did not know what the man was yelling about. Montes further stated, "Then we got to that office, he was standing right with his side part of his body blocking for her to get in. So when I walked to the door, I got in between them and I opened the door to allow [Gill] to get in." Montes also explained this encounter at the office door by stating, "[W]hen I approached them, I got in between them two and opened the door handle and allowed—I had to push the guy to give me space to open the door and allow [Gill] to get in, and then I followed her." After Montes opened the door, Gill walked in, and Montes followed her and closed the door. Montes testified that, at this point, Gill was "very upset" and had "watery eyes." Montes stated that while in the office, he could see the man with dreadlocks standing outside the office door for "[a]t least a good five minutes." Montes testified that Gill called his attorney once inside the

- 4 -

office. After the phone call, Montes asked if it was okay to leave, and Gill said it was, so he left and went home. Montes stated that when he and Gill first walked into the office, there was a man and a woman already in the office. Montes also stated that he could tell Gill was pregnant at that time because "[h]er belly was pretty big."

¶ 10    On cross examination, Montes stated that he did not see anyone put his finger in Gill's face, and did not hear or see anyone say anything to Gill inside the courtroom. Montes also stated that he never heard the man with dreadlocks call Gill a bitch, did not hear him say "fuck you, bitch," and did not hear that man threaten any physical harm to Gill. Montes also testified that he never saw the man with dreadlocks put his hands in Gill's face or use any hand gestures in her face. Montes explained that he was "facing down," was "wondering about [his] own case," and did not hear what the man with dreadlocks was saying as he followed Gill to the office. Montes testified that he spoke with an investigator from the sheriff's department and gave a written statement in connection with his interview. Montes stated that his written statement included that he pushed the man with the dreadlocks in the chest, but when pressed, the State volunteered to stipulate that it was not in Montes's statement.

¶ 11    Assistant State's Attorney Debra Chessick testified next. She stated that, in March 2014, she worked in the traffic courtrooms on the fourth floor of the Daley Center. Around 10 a.m. on March 19, 2014, Chessick was on the phone in the small satellite office when she heard some commotion, including "loud noises, maybe some yelling." Chessick explained that when the door to the office is closed, a person could not hear exactly what is going on outside the door. Chessick testified that she saw Gill and two men entering the office. She stated that Gill was on the right, Montes in the middle, and defendant on the left. Chessick explained that "[a]s *** Montes was in the middle, he kind of had his arm stretched out to be a barrier in between the defendant and [Gill]. His hand was either on the glass or on the handle of the door to allow [Gill] access to the room." Chessick stated that defendant did not come into the office, but stayed outside of the door, pacing back and forth and yelling. Chessick described Gill as "very upset" because her face was flushed and she looked like she was about to start crying. Chessick stated that Gill asked her to use the phone, so Chessick put the phone down, and Gill made a short phone call. Chessick testified that a law clerk, Bobby Cannatello, came into the office, and shortly thereafter law clerk Kudzy also came into the office.

¶ 12    Chessick further testified that she stepped one or two feet out of the office and told defendant to get away and that he had to get out of there. Chessick stated that defendant stepped back about seven feet, but was still visible from the office and was just across the hallway. Chessick testified that defendant was still loud at this point and demanded that Chessick give him Gill's name and her information. Chessick also testified that defendant had his cell phone in his hand and said he was talking to his lawyer. Chessick described defendant's voice as "demanding like he needed to get that information right that very second." When asked how she felt at that moment, Chessick responded that she felt "scared" and stated "I [did not] feel safe. I [did not] know what he was going to do next, and I wished that there had been a sheriff that was close by to make him step away to get further away from our office." When Chessick stepped back into the office, Gill tried to call their supervisor but was too upset, so Chessick took the phone and told the supervisor what had happened. Then, a sheriff's deputy came over to speak with defendant.

¶ 13    On cross examination, Chessick testified that she never heard defendant say "fuck you bitch." Chessick also testified that she was sure she briefly spoke to investigator Goshen, but

- 5 -

did not remember the conversation very well. She recalled that she told the investigator that she saw defendant on his cell phone. Chessick stated that she "[did not] hear [defendant] threaten [Gill] with words," but "the way his body was when she was coming into the room was threatening." Chessick also testified that she never saw defendant physically grab or put his hands on Gill. She also never heard defendant threaten to grab Gill.

¶ 14   On redirect examination, Chessick testified that she saw defendant trying to get into the office. On recross examination, Chessick stated that defendant was trying to get into the office "[i]nitially when they were in the doorway." When asked if she told the investigator that defendant tried to get into the office, Chessick responded that she did not remember.

¶ 15   The State's final witness in its case-in-chief was Deputy Joe Glover of the Cook County Sheriff's Department, who testified that on March 19, 2014, he was assigned to courtrooms 402 and 404 of the Daley Center, which meant that he was to go back and forth between those two courtrooms throughout the day. Deputy Glover testified that Judge Gallagher was "pulling double duty" and also going between the two courtrooms that day. Deputy Glover testified that Judge Gallagher ran through the call in courtroom 404 and then they went to courtroom 402, where Gill was working. Deputy Glover stated that when the first case was called in courtroom 402, Gill and a defendant were at the bench, and "Judge Gallagher got up visibly upset." Deputy Glover stated that he could hear the "displeasure" in the judge's voice, and the judge then left the bench and took a recess. Deputy Glover stated that Gill then left the courtroom through the doors leading out to the hallway, and that defendant, who was standing at the back of the room, "mentioned something to her, turned towards her and exited the courtroom with her." Deputy Glover could not hear what defendant had said to Gill and could not hear whether Gill said anything back to defendant. After Gill left the room, Deputy Glover went to courtroom 404 with Judge Gallagher through the private hallway behind the courtrooms. Deputy Glover further testified that while in the private hallway, he was approached by law clerk Kudzy, who was frantic, and told him that "there was some guy yelling and screaming at [Gill]." Deputy Glover called the security supervisor to report the disturbance and then went into the public hallway with Kudzy, where she pointed to defendant, who was down the hall approximately six feet from the state's attorney's satellite office door. Deputy Glover testified that he observed defendant on his phone at this time, though defendant did not appear to be doing anything while on the phone. Deputy Glover then instructed defendant "to step back into [r]oom 402 where he started his day to wait for his case to be called" and defendant complied. Deputy Glover stated that after defendant's case was called, he and other security officers took defendant into custody.

¶ 16   On cross examination, Deputy Glover testified that he never heard defendant yell or curse at anyone.

¶ 17   The State then rested its case-in-chief, and the trial court denied defendant's motion for a directed verdict.

¶ 18   The defense first called defendant to testify. Defendant testified that at approximately 9 a.m. on March 19, 2014, he was in courtroom 402 on the fourth floor of the Daley Center to pay off a fine for a traffic matter. Defendant testified that the courtroom was standing room only, so he stood in the back of the courtroom with a few other people. Defendant stated that court started "a little late," and that Montes's case was about the third case called. Defendant further stated that the judge became upset with Gill, raised his voice, and threw some papers down before calling a recess and going to the courtroom next door. Defendant testified that

Gill "seemed to be physically a little bit upset at how the judge handled her at that point." Defendant stated that at this point, he was "in conversation with a young lady at the back of the courtroom in regards to what was going on." Specifically, he said that he and this unknown woman were "conversing back and forth" and the unknown woman commented that it seemed as though the deputy was trying to lock up Montes. Defendant testified that, in response, he said "yeah, wow, that [assistant state's attorney] really pissed the judge off." Defendant stated that he did not know that Gill was coming out of the courtroom at the same time as he and the unknown woman, and that Gill interrupted their conversation by stating "well, don't you worry about who is getting locked up today, you worry about yourself getting locked [up]." In response to Gill, defendant testified, "Simultaneously, as I asked her, are you threatening me ma'am, I put my right hand in my pocket and grabbed my cell phone, instantly called my attorney, William Laws, at that point." Defendant testified that he took Gill's words as a threat because he had not appeared before the judge yet and he felt threatened by Gill because "she say[s] she is not a person that can have [me locked up], but look at what [I am] going through now. Off her word I was arrested that day." Defendant stated that he then headed down the hallway to retreat to the bathroom to have a private conversation with his attorney to find out why the assistant state's attorney "was saying she is going to lock me up or I could be locked up." Defendant explained that his attorney had told him that it was okay to attend court by himself on that date. He also explained that he wanted to go to the bathroom to have a private conversation because there were people in the hallway coming in and out of the courtrooms. Defendant testified that when he was walking to the bathroom, Gill was about three steps behind him. Defendant saw Gill go into the state's attorney's satellite office, which he described as being "pretty much adjacent to the men's bathroom." Defendant then asked his attorney where he could file a complaint, and looked through the door of the office Gill entered "to see if there was a name on the front of the desk to go and make my complaint." Defendant stated he was about seven or eight feet from the door when he was looking in. Defendant denied ever trying to touch the door of the office. Defendant also denied that Montes ever touched him and stated that Montes "never even came near me."

¶ 19    Defendant further testified that, eventually, someone came out of the office and got "Deputy Joe," who approached defendant and said, "[H]ey, when you get done with your call, just step back into the courtroom for me." Defendant testified that when he went back into courtroom 402, he asked the clerk what the name of the female state's attorney that was previously before the judge in that courtroom. The clerk did not know her name and told defendant to ask a male assistant state's attorney who was present, but he turned his back and walked away from defendant. Defendant testified that when his case was finally called, he was told to sit in the front because one of the assistant state's attorneys stated that defendant was to be "locked up today." Thereafter, defendant was arrested. Defendant denied ever saying "fuck you" to Gill, denied ever calling her a bitch, and denied ever trying to touch her. Defendant also testified that he never put his hands in Gill's face and never threatened her.

¶ 20    On cross examination, defendant testified that the men's bathroom is "down the hall" from the state's attorney's satellite office. He also testified that he had his attorney's phone number on speed dial. Defendant stated that on the date in question he did not know that Gill was pregnant and explained that Gill "is shorter than I am, so when she made the comment to me when I was leaving out the courtroom, when I turned around, the only thing I actually saw was her face." Defendant also stated that he did not know the name of the woman he spoke with at

the back of the courtroom. Additionally, defendant testified that Montes's testimony that he went in between Gill and defendant was untrue. Defendant further stated that he never raised his voice at Gill, but that she, in fact, yelled at him. Defendant stated that Gill raised her voice similar to how the prosecutor was currently raising his voice at defendant during cross examination. When asked if he felt threatened by the prosecutor, defendant responded that he did not feel threatened but felt intimidated. The prosecutor then asked, "Though I am intimidating you, nothing is stopping you from saying a lot of things to me, is it?" Defendant responded:

> "You have to look at it like this, sir. Once again, there is a time and place for everything. Any time as a black man you are in a courthouse, you have to be conscious of what [*sic*] and what you do. So me responding to you negatively will not do anything positive for me, nor would it have done anything for me responding negative[ly] to [Gill] down at the Daley Center."

¶ 21    Subsequently, defendant was asked what his race had to do with this case, and defendant responded that "we can say it has nothing to do with it, we can say it has everything to do with it, but I mention my race just as much as you mention her pregnancy." Defendant further testified that he was about 5 feet, 9 inches tall, but did not know how much he weighed. When asked by the prosecutor if, as a 5-foot, nine-inch man, he was threatened by "this pregnant woman," defendant responded, "Yes, sir. You can get pulled over by [an] officer [that is] 4'10". We are not talking about [stature] that makes a person a threat." Defendant confirmed that Gill was not wearing a gun or badge on the date in question and explained, "Without the gun and badge, she still has me here today, so I was very much threatened at that point in time in my life." Defendant also confirmed that he never filed a complaint against Gill.

¶ 22    The defense next called investigator Leann Goshen from the Cook County Sheriff's Department. Goshen testified that on March 19, 2014, she was called to the Daley Center to investigate an incident involving a threat to a public official. Goshen said that she and her partner conducted interviews with Gill and defendant and stated, "There might have been a couple other interviews." Goshen testified that during the interviews she took notes and ultimately prepared a report. When asked if during the interview Gill ever told her that defendant said, "[C]ome out here and talk to me bitch," Goshen responded, "In my notes I didn't write that because things are in summary. It is not verbatim." Goshen further testified that she did not write that defendant said, "[F]uck you bitch" in her report. The report also did not state that defendant tried to grab the handle of the satellite office door, but did state defendant had blocked the doorway. Goshen also testified that her report only stated that defendant was making gestures, but did not state that he pointed a finger in Gill's face. Goshen testified that she also interviewed Montes, but stated her report did not mention of Montes ever pushing defendant in the chest. Goshen also interviewed Chessick and testified that Chessick never told her that defendant attempted to enter the satellite office.

¶ 23    On cross examination, Goshen read the following excerpt from her report:

> "[Defendant] approached *** Gill making rude comments. [Defendant] followed *** Gill to her office yelling, pointing her finger in his—excuse me—pointing his finger in her face. [Defendant] blocked the doorway of *** Gill's office, not letting *** Gill enter her office."

Goshen then clarified that, in fact, defendant's finger pointing was included in her report. Goshen also stated that she never asked Gill what exact words defendant yelled at her. Goshen

further testified that for each interview she conducted, she was just looking for a summary or a "general sense" of what occurred.

¶ 24    In rebuttal, the State called law clerk Bobby Cannatello, who testified that on the date at issue, he was working as a law clerk for the State's Attorney's Office and was assigned to courtroom 408. Cannatello testified that at approximately 9:45 a.m., he left courtroom 408 to go to the satellite office down the hall. He estimated that the walk between the courtroom and the office took 45 seconds. Cannatello testified that while he was walking down the hallway to the office, he "heard a man's voice, a deep voice fairly loud." He identified defendant as the man whose voice he heard. Cannatello testified that defendant was approximately one foot from the satellite office door and was yelling, "This is fucking bullshit, come out of the office. I want your fucking name, bitch." Cannatello then entered the office, where he observed Gill, Chessick, and "a Latino gentleman." Cannatello testified that when he entered the office, the door was closed, and is always closed because "[i]t automatically closes." Cannatello further testified that he noticed that Gill was "red, teary-eyed" and was crying "kind of hysterical." Cannatello asked if there was anything he could do, such as get the sheriff's bailiff, but he remained in the office because he "felt uncomfortable leaving [Gill] and [Chessick] alone." Cannatello testified that while in the office, he could hear defendant in the hallway screaming, "[C]ome out of the office you fucking bitch, give me your fucking name, this is bullshit." Shortly after Cannatello arrived in the office, law clerk Kudzy came in, but she left immediately to get the sheriff's bailiff, who arrived about 30-45 seconds later. Cannatello testified that he then saw the sheriff and defendant walking down the hallway.

¶ 25    On cross examination, Cannatello testified that defendant never spoke to him, and he could not recall whether defendant was on the phone during the occurrence. Cannatello also testified that he spoke with investigator Goshen approximately two or three hours after the occurrence. Cannatello stated that he told Goshen that defendant had said, "[T]his is fucking bullshit." Goshen was taking notes during their interview, but Cannatello could not see what she was writing down. Cannatello stated that his conversation with Goshen was "less than a minute long" but that he told her that defendant said, "I want your name, bitch" and "come out of the fucking office." Cannatello testified that while he was in the office with Gill and Chessick, he did not make any attempt to contact any sheriffs or police officers.

¶ 26    The defense then re-called Goshen in rebuttal, who testified that she spoke with Cannatello after the incident in question and took notes during their conversation. Goshen also testified that she recalled Cannatello saying that an individual was yelling, but could not recall what his exact words were. When presented with her report from her interview with Cannatello, Goshen testified that neither her notes nor her report included that defendant said, "[T]his is fucking bullshit," "I want your name, bitch," or "come out of the fucking office, bitch." Goshen explained that her notes are not verbatim.

¶ 27    On cross examination, Goshen testified that her interview with Cannatello lasted less than a minute. She also stated that he could have told her all of the expletives that defendant was yelling, but that she just did not include them in her report. Goshen stated that her notes are merely "summaries."

¶ 28    After closing arguments, the jury was instructed about the offense of threatening a public official by Illinois Pattern Jury Instructions, Criminal, Nos. 11.49 and 11.50 (4th ed. 2000) (hereinafter IPI Criminal 4th). The court also instructed the jury that "[a] person holding the position of assistant state's attorney is a public official" pursuant to IPI Criminal 4th No.

11.49A. Further, the jury was given an instruction regarding the definition of a threat based on IPI Criminal 4th No. 13.33F (1)-(2), (5). Specifically, the court stated, "The word threat means a menace, however communicated, to inflict physical harm on the person threatened or any other person or on property or subject any person to physical confinement or restraint or expose any person to hatred, contempt, or ridicule." The defense did not object to the giving of this instruction, and did not request that an instruction be given regarding the definition of a "true threat."

¶ 29    The jury found defendant guilty of threatening a public official and unlawful restraint, but acquitted him of intimidation. Defendant filed a motion for new trial, arguing, *inter alia*, that the jury's verdicts were legally and factually inconsistent and against the manifest weight of the evidence. The motion was denied on April 14, 2015. Also on that date, the court merged the unlawful restraint count into the threatening a public official count and sentenced defendant to two-and-a-half years' imprisonment. Defendant subsequently filed a motion to reconsider his sentence, which was denied on June 3, 2015. Defendant filed his timely notice of appeal on June 16, 2015. Oral argument was held in this case on August 30, 2018.

¶ 30                                    II. ANALYSIS

¶ 31    Defendant raises four arguments on appeal: (1) defendant's conviction for threatening a public official should be reversed because the State failed to prove beyond a reasonable doubt that he intended to convey any threat, much less a true threat; (2) in the alternative, defense counsel deprived defendant of a fair trial when counsel argued that the jury should acquit him of threatening a public official because his speech was protected by the first amendment, but failed to request a true threat jury instruction; (3) the threatening a public official statute violates the constitutional guarantees of free speech and due process because the statute does not require proof that a defendant had the subjective intent to make a true threat; and (4) defendant's unlawful restraint conviction should be reversed because his speech, directed to a public official, cannot be categorized as "fighting words" that conveyed a true threat, and thus his speech was protected from criminal sanction by the first amendment. We address each below.

¶ 32               A. Sufficiency of the Evidence for Threatening a Public Official

¶ 33    We first address defendant's contention that the State failed to prove him guilty beyond a reasonable doubt of the offense of threatening a public official.

¶ 34    Section 12-9 of the Criminal Code of 2012 (Code) (720 ILCS 5/12-9 (West 2014)) provides, in relevant part:

> "(a) A person commits threatening a public official or human service provider when:
>
>> (1) that person knowingly delivers or conveys, directly or indirectly, to a public official or human service provider by any means a communication:
>>
>>> (i) containing a threat that would place the public official or human service provider or a member of his or her immediate family in reasonable apprehension of immediate or future bodily harm, sexual assault, confinement, or restraint; or
>>>
>>> *** and

- 10 -

(2) the threat was conveyed because of the performance or nonperformance of some public duty or duty as a human service provider, because of hostility of the person making the threat toward the status or position of the public official or the human service provider, or because of any other factor related to the official's public existence."

¶ 35 Generally, the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction "is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Citing *Duncan v. Peterson*, 408 Ill. App. 3d 911 (2010), defendant asserts that the *Jackson* standard does not apply to this matter. In *Duncan*, the court recognized that "[w]e review *de novo* whether a statement qualifies as constitutionally protected speech under the first amendment." *Id.* at 918. In response, the State points out that the court in *People v. Dye*, 2015 IL App (4th) 130799, ¶ 11, a case upon which defendant heavily relies for its substance, applied the *Jackson* standard, and contends that defendant's argument regarding *Duncan* is misplaced because that case examined whether a statement was constitutionally protected as religious opinion and this case is not about whether a specific statement was protected. The State further contends that the *Jackson* standard is proper because the facts of this case involve the totality of defendant's conduct toward Gill, which cannot be distilled into a "statement." We agree with the State's characterization of the issues before this court, and thus must determine whether any rational trier of fact could have found defendant guilty beyond a reasonable doubt of threatening a public official.

¶ 36 Defendant does not contest that Gill was a public official at the time he confronted her or that he knew this to be the case. Instead, defendant argues that he did not convey a threat, let alone a "true threat" as was necessary in order to convict. Defendant advances two arguments on this point. First, defendant contends that the State's evidence failed to prove that he threatened a public official because the evidence shows that he did not convey any threat to Gill and Gill herself testified that defendant did not verbally threaten her with bodily harm. In the alternative, defendant argues that the State failed to prove that he intended to convey a "true threat," and thus his conviction violates the first amendment of the United States Constitution.

¶ 37 Various Illinois statutes, including section 12-9 of the Code, criminalize the making of threats. The first amendment, applicable to the states through the fourteenth amendment, prohibits the enactment of laws "abridging the freedom of speech." U.S. Const., amends. I, XIV. The first amendment signifies that the government does not have the power to prohibit expression based on its subject matter, message, ideas, or content. *Ashcroft v. American Civil Liberties Union*, 535 U.S. 564, 573 (2002). However, the United States Supreme Court has recognized that there are categories of expressions that are not protected by the first amendment, such as "true threats." *United States v. Alvarez*, 567 U.S. 709, 717 (2012) (plurality opinion). We have consistently held that if the State charges a defendant with making a threat of violence, the threat must be a "true threat," or else the prosecution would violate the first amendment. *People v. Wood*, 2017 IL App (1st) 143135, ¶ 13, *appeal denied*, No. 123250 (Ill. May 30, 2018); *Dye*, 2015 IL App (4th) 130799, ¶ 8; *People v. Sucic*, 401 Ill. App. 3d 492, 502-03 (2010).

¶ 38 Further, when interpreting section 12-9 of the Code, "we have held that intentionality on the defendant's part is required." *Wood*, 2017 IL App (1st) 143135, ¶ 13 (citing *Dye*, 2015 IL

App (4th) 130799, ¶ 10). In *Dye*, this court observed that "a 'true threat' requires intentionality [citation], in contrast to section 12-9(a)(1) [citation], which, by its terms, requires merely knowledge ('knowingly')." *Dye*, 2015 IL App (4th) 130799, ¶ 10. This means that in order for a defendant's conviction for threatening a public official to stand, the threat must have been a "true threat." See *id.* In *Virginia v. Black*, the Supreme Court explained a "true threat" as follows:

> " 'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. [Citations.] The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats protect[s] individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur." (Internal quotation marks omitted.) 538 U.S. 343, 359-60 (2003).

¶ 39    Pursuant to *Black*, the question we must address is whether the State proved beyond a reasonable doubt that defendant communicated a serious expression of intent to commit an act of unlawful violence against Gill that placed Gill in reasonable apprehension of immediate or future bodily harm, sexual assault, confinement, or restraint. The parties disagree over the perspective from which we analyze this question. Defendant argues that after *Black* was decided, courts have used a subjective speaker-based test—whether a reasonable person would understand that the person making a threatening statement intended to make a true threat under the circumstances—when determining whether a statement is entitled to first amendment protection. The State responds that the traditional, objective test that was used prior to *Black*—whether an ordinary, reasonable recipient would interpret the defendant's statement as a threat—still applies.

¶ 40    Our supreme court recently acknowledged that "it is unclear whether the true threat exemption from the first amendment would apply to a statement made with innocent intent but which negligently coveys a message that a reasonable person would perceive to be threatening" (*People v. Relerford*, 2017 IL 121094, ¶ 38), but did not resolve the issue. The State relies on *People v. Diomedes*, 2014 IL App (2d) 121080, to support its position. There, the Second District looked to the federal courts and examined this issue as follows:

> "In *United States v. Parr* [citation], the Seventh Circuit discussed that there also exists a split of authority on whether (based on *Black*'s language that true threats encompass statements wherein the speaker *means* to communicate a serious threat to harm) a *subjective* element was introduced into the analysis or whether the traditional, objective reasonable-person test should continue to be applied. In doing so, however, it described the traditional objective test as asking whether a reasonable speaker would understand that his or her statement would be interpreted as a threat (the 'objective "reasonable speaker" ' test) *or, alternatively*, whether a reasonable recipient would interpret the statement as a threat (the objective ' "reasonable recipient" ' test). [Citation.] The *Parr* court stated that '[t]his circuit has not yet addressed the issue,' and it described its former decision in *Fuller* as merely 'a post-*Black* true threats case applying, without reference to *Black*, the traditional objective "reasonable person" test.' [Citation.]
>
> Accordingly, it appears that the Seventh Circuit's approach has been, and remains, an objective one, which allows evaluation of the speaker's communication under either the reasonable-speaker or the reasonable-recipient test. Further, although courts in this

- 12 -

state have not explicitly decided the issue, the approach also appears to be objective. For example in *Sucic*, the defendant relied on *Black* to argue that a subjective approach should be applied to determine whether his statements amounted to true threats. [Citation.] In addressing that claim, the court noted that, while there has been a federal split of authority interpreting *Black*, Illinois courts have found that the term 'threat' implies generally that the expression has a 'reasonable tendency to create apprehension that its originator will act according to its tenor.' (Internal quotation marks omitted.) [Citation.] This definition suggests that an objective, not a subjective, approach continues to apply. [Citation.]

Therefore, it appears that neither the objective reasonable-speaker nor the objective reasonable-recipient approach is foreclosed from our consideration. Indeed, in our view, the reasonable-speaker test, by requiring consideration of how others might interpret the communication, essentially subsumes or encompasses the reasonable-recipient test. In any event, even applying, per defendant's request, the reasonable-speaker approach, we conclude that the evidence here is such that a speaker would reasonably foresee that a listener would reasonably interpret the communication as a serious expression of intent to harm." (Emphases in original.) *Id.* ¶¶ 33-35.

¶ 41    Conversely, defendant relies on *Dye* and *Wood* as support for a test with a subjective component. In *Dye*, the Fourth District applied a subjective test in reaching its conclusion that the evidence did not prove that when the defendant told an assistant public defender, " ' "I'm gonna get you," ' " the defendant intended to convey the idea of violent retribution, as opposed to nonviolent retribution. *Dye*, 2015 IL App (4th) 130799, ¶ 12. Similarly, in *Wood*, this court determined that the Supreme Court's decision in *Elonis v. United States*, 575 U.S. ___, ___, 135 S. Ct. 2001, 2011 (2015), required that "statutes criminalizing speech for being threatening require proof that the speaker intends the communication to be a threat and that a reasonable listener would understand the communication to be threatening." *Wood*, 2017 IL App (1st) 143135, ¶ 13.

¶ 42    The State has failed to present, and we have not found, a compelling reason why we should depart from the test applied by this court in *Wood*. The decision in *Wood* resulted from this court's analysis of the same issue with which we are now faced. As such, we apply the same test as in *Wood*, and thus decide whether the State proved beyond a reasonable doubt that defendant intended his communication to Gill to be a threat that a reasonable listener would understand to be threatening. See *id.* Had we opted to apply the State's version of the test, then our question would be whether the State proved beyond a reasonable doubt that a reasonable person in defendant's position would have foreseen that a listener would reasonably interpret his communication as a serious expression of intent to harm. See *Diomedes*, 2014 IL App (2d) 121080, ¶ 35. We find it difficult to reconcile the State's proposed test with *Black*'s declaration that " '[t]rue threats' encompass those statements where the speaker *means* to communicate a serious expression of an *intent* to commit an act of unlawful violence to a particular individual or group of individuals." (Emphases added.) *Black*, 538 U.S. at 359-60. We also fail to see how the State could prove the requisite elements of threatening a public official without a subjective component because section 12-9 of the Code requires that a person "knowingly" convey a communication containing a threat. 720 ILCS 5/12-9 (West 2014). A person acts knowingly if he is consciously aware that his conduct is practically certain to cause the prohibited result. *People v. Lengyel*, 2015 IL App (1st) 131022, ¶ 45. Thus, the language of the statute makes

- 13 -

clear that defendant's subjective intent is relevant to determine whether the State satisfied the requisite elements.

¶ 43    Defendant asserts that the State failed to prove him guilty beyond a reasonable doubt of threatening a public official because the evidence did not establish that defendant intended to communicate a "true threat." Specifically, defendant asserts that the State presented no evidence that defendant issued a distinct verbal threat to Gill, and instead only presented evidence of him yelling obscenities at her. Further, defendant asserts that the State did not prove that defendant meant to communicate a serious expression of an intent to commit an act of unlawful violence as is required in order to establish a "true threat." *Black*, 538 U.S. at 359-60. The State responds that it satisfied its burden by proving that defendant's "true threat" was communicated by the totality of his unambiguously menacing conduct. We find that, viewing the evidence in the light most favorable to the prosecution, no rational trier of fact could have found the essential elements of threatening a public official beyond a reasonable doubt where the State presented no evidence that defendant meant to communicate a serious expression of an intent to commit an unlawful act of violence. See *Jackson*, 443 U.S. at 319.

¶ 44    Defendant relies on *Wood* and *Dye* as support for his contentions, and we find those cases instructive. In *Wood*, this court was recently faced with a question similar to the one before us now. There, the defendant was charged with threatening a public official after he left a voicemail for his public defender wherein the defendant stated, *inter alia*, that he hated the judge who presided over his case and "pray[ed] for the death and destruction upon the judge and upon every single person who sentenced [him]." *Wood*, 2017 IL App (1st) 143135, ¶ 4. On appeal, the defendant argued that his conviction should be reversed because he did not convey any communication to the judge, and because the content of his speech was not a "true threat." *Id.* ¶ 12. The court began by determining whether the defendant even made a threat to the judge, and defined a threat as " '[a] communicated intent to inflict harm or loss on another or on another's property.' " *Id.* ¶ 13 (quoting Black's Law Dictionary 1618 (9th ed. 2009)). The court added that intentionality by the defendant is required when interpreting section 12-9 of the Code and that intentionality means that for a conviction for threatening a public official to stand, the threat must be a "true threat." *Id.* The court further explained, "Under recent Supreme Court precedent, statutes criminalizing speech for being threatening require proof that the speaker intends the communication to be a threat and that a reasonable listener would understand the communication to be threatening." *Id.* (citing *Elonis*, 575 U.S. at ___, 135 S. Ct. at 2011).

¶ 45    The *Wood* court focused on the part of defendant's statements that " 'there is not a day that goes by since I was sentenced at that courthouse that I have not dreamed about revenge and the utter hate I feel for the judge' and 'there's not a day that goes by that I don't pray for the death and destruction upon the judge.' " *Id.* ¶ 14. The court determined that neither of these statements, individually or in their entirety, threatened immediate or future bodily harm, sexual assault, confinement, or restraint as required by section 12-9 of the Code. *Id.* Additionally, the court stated that the defendant's statements were not " 'serious expression[s] of an intent to commit an act of unlawful violence to a particular individual.' " *Id.* ¶ 15 (quoting *Black*, 538 U.S. at 359). In fact, the court opined that the defendant never said he was going to do anything, but instead merely hoped and prayed that bad things would happen to those he felt had wronged him. *Id.* The State contended that the circumstances surrounding the phone call showed that the defendant intended to make a threat and that a reasonable person could

construe the communication as a threat. *Id.* ¶ 16. The State also pointed out that the defendant was upset at the time he called, called from a blocked number, and did not leave his name on the voicemail. *Id.* Additionally, the judge, who was the subject of the defendant's phone call, testified at trial "about his subjective apprehension after the message was played for him by the assistant public defender" and that he "became suspicious of others and was scared for the safety of himself and his family." *Id.* The court acknowledged that the "circumstances surrounding the threat are obviously important." *Id.* (citing *Watts v. United States*, 394 U.S. 705, 708 (1969) (*per curiam*)). However, the court ultimately held that although "unsettling," the context provided by the State did not transform the defendant's remarks into a true threat because there was no evidence establishing that the defendant intended to convey the idea of violent retribution. *Id.* ¶ 17. The court explained that the statements at issue did not warn of any future harm, were vague and ambiguous, and did not indicate any actual intent to carry out a threat or any intent to affirmatively do anything. *Id.* ¶ 22. The court also characterized the defendant's statements as "distasteful, inept, and crude," but nonetheless "not criminal." *Id.* The court concluded, "The State cannot criminalize a defendant's dream for revenge unless, along with that expressed dream, the defendant seriously expresses an intention to commit an act of unlawful violence to fulfill his dream." *Id.*

¶ 46        We also find *Dye* applicable to the case at bar. In *Dye*, the defendant and his public defender had a meeting where the public defender informed the defendant that she had subpoenaed some documents and inadvertently uncovered evidence that would be harmful to the defendant's case, and that the State would receive a copy of this harmful evidence. *Dye*, 2015 IL App (4th) 130799, ¶ 3. The defendant became irate and pointed at the public defender and told her, " ' "I'm gonna get you," ' " two or three times. *Id.* ¶¶ 4-5. The public defender responded, " ' "Are you fucking threatening me?" ' " and the defendant stated, " ' "No, no. I ain't threatening you." ' " *Id.* ¶ 5. During this confrontation, a paralegal stepped between the defendant and the public defender because of the defendant's mannerisms, aggressive speech, and posture. *Id.* The public defender was "scared, trembling, and on the verge of tears." *Id.* ¶ 6. On appeal, the court reversed defendant's conviction for threatening a public official because it found that it would have been impossible for any rational trier of fact to find, beyond a reasonable doubt, that the defendant made a "true threat" within the meaning of *Black*. *Id.* ¶ 1. Specifically, the court held that the defendant's threat, " ' "I'm gonna get you," ' " was ambiguous as to whether the intended meaning was violent retribution or nonviolent retribution, and the context of the threat could not reasonably resolve the ambiguity. *Id.*

¶ 47        At the outset of its analysis, the *Dye* court stated, "we interpret section 12-9 as requiring intentionality." *Id.* ¶ 10. The court then acknowledged that "no witness had direct sensory access to defendant's mind and intent," and thus "the trier of fact could determine what he intended only by drawing inferences from his conduct, including what he said." *Id.* ¶ 11. The court framed the question before it as, "Looking at the evidence in the light most favorable to the prosecution, would it be possible for any rational trier of fact to find, beyond a reasonable doubt, that defendant intended to physically threaten [his public defender]?" *Id.* The court concluded that there was no evidence that would justify a reasonable inference that the defendant intended to convey the idea of violence. *Id.* ¶ 12. Specifically, the court noted that during the encounter at issue, the defendant and his public defender were both shouting and a witness had described the defendant's speech and posture as " 'aggressive.' " *Id.* Nonetheless,

- 15 -

the court explained, "When people are angry, however, they tend to become loud and tense and to make vigorous gestures—even when threatening to do something nonviolent." *Id.*

¶ 48        In this case, like in *Wood* and *Dye*, the evidence presented by the State was not sufficient to prove that defendant meant for his communications and expressions to Gill to convey a serious intent to carry out an unlawful act of violence. Simply put, the State did not meet its burden to prove that defendant meant to threaten Gill with unlawful violence. It is undisputed that defendant did not make any verbal threats to Gill. Gill testified that defendant never verbally threatened her with bodily harm. Gill testified that defendant initially approached her after the judge stormed off the bench on the date at issue by laughing, pointing at her, and stating that "oh, you made the judge mad; ha ha, you made the judge mad." Gill stated that she responded, "[B]etween the two of us you are here on bond, so why don't you find a seat." Defendant, on the other hand, testified that Gill stated, "[W]ell, don't you worry about who is getting locked up today, you worry about yourself getting locked [up]." Gill testified that subsequently defendant followed her to the satellite office, and told her to "come back here and say that to my face, get back here and say that to my face." Gill also testified that defendant screamed, "[F]uck you, bitch, come back here and say that to my face, you can't talk to me, fuck you bitch." Montes, who was near Gill during the encounter, did not know what defendant was yelling about, but testified that he never heard defendant say "fuck you, bitch" or threaten her with physical harm. Chessick testified that defendant demanded that she give him Gill's name and her information, but that she never heard defendant say "fuck you, bitch." Likewise, Deputy Glover testified that he did not hear defendant yell at Gill. The only witness besides Gill to testify that defendant used expletives was Cannatello, who testified that he heard defendant yell, "This is fucking bullshit, come out of the office. I want your fucking name, bitch." Defendant denied ever calling Gill a bitch or saying "fuck you" to her.

¶ 49        This foregoing testimony establishes that there was no evidence that defendant verbally threatened Gill. This is significant because, as a result, whether the State met its burden depends on whether any rational trier of fact could reasonably infer from defendant's expressions and demeanor that he intended to commit an unlawful act of violence against Gill. As stated in *Dye*, "the trier of fact could determine what [defendant] intended only by drawing inferences from his conduct, including what he said." 2015 IL App (4th) 130799, ¶ 11. After reviewing the evidence, we find that no rational trier of fact could have found that the State proved beyond a reasonable doubt that defendant intended to convey an unlawful threat of violence to Gill. Merely because defendant used offensive language in a loud voice does not create a reasonable inference that he intended to use violence. As stated in *Dye*, "When people are angry, however, they tend to become loud and tense and to make vigorous gestures—even when threatening to do something nonviolent." *Id.* ¶ 12. Additionally, the evidence did not show beyond a reasonable doubt that defendant made any overtly threatening gestures. Gill testified that defendant put his finger in her face. However, this is not an overtly threatening gesture, such as shaking a fist at someone, dragging a finger across one's throat, or pounding a fist into an open hand. In the context of the factual scenario here, defendant's pointing at Gill while yelling his desire to learn her name in an expletive-laden tirade does not rationally indicate his desire to inflict violent harm on Gill. Defendant argues, and we agree, that there is no case wherein conduct similar to his was deemed sufficient to convict someone of threatening a public official.

¶ 50    The State argues that defendant communicated his threat to Gill through the totality of his "unambiguously menacing and threatening conduct." We agree with the State that we must look to the totality of defendant's conduct because "[t]he circumstances surrounding the threat are obviously important." *Wood*, 2017 IL App (1st) 143135, ¶ 16 (citing *Watts*, 394 U.S. at 708). However, we disagree that the totality of defendant's conduct evidenced his intent, or allowed reasonable inferences to be drawn therefrom that would evidence his intent, to convey a serious threat of unlawful violence against Gill. Rather, the evidence creates a reasonable inference that defendant was attempting to obtain Gill's name so that he could file a complaint against her. Gill denied that defendant ever asked for her name, but Chessick and Cannatello both testified that defendant asked for Gill's name. We find this similar to the factual scenario in *Dye*. There, the court found that the defendant did not intend to convey the idea of violent retribution when he told his public defender, " ' "I'm gonna get you." ' " *Dye*, 2015 IL App (4th) 130799, ¶ 12. The court reasoned that " '[g]et' " was "just as apt a word for nonviolent punishment as violent punishment and some additional facts, beyond the mere utterance, would be necessary to infer, beyond a reasonable doubt, that 'I'm going to get you' was intended as a threat of violence." *Id.* Here, the evidence established that defendant asked for Gill's name on numerous occasions and was observed talking on the phone by multiple witnesses. Defendant testified that he was on his phone because he was calling his attorney to seek advice as to how to file a complaint against Gill. The evidence also established that defendant demanded Gill give him her name, that defendant demanded Chessick give him Gill's name, and that defendant yelled obscenities outside the office in order to obtain this information. Chessick specifically testified that defendant's speech was "demanding like he needed to get that information right that very second." This indicates that defendant's intent was focused on obtaining Gill's name, not inflicting violent harm upon her.

¶ 51    In *Dye*, the defendant's speech and posture were described as " 'aggressive.' " *Id.* Here, Chessick testified that, although she did not hear defendant threaten Gill with words, "the way his body was when she was coming into the room was threatening." Chessick also testified that she "[did not] feel safe." However, Chessick's testimony regarding "the way [defendant's] body was" does not create a reasonable inference of defendant's intent to threaten Gill with violence because defendant's conduct was not overtly threatening and Chessick did not provide an explanation that would lead a rational trier of fact to infer defendant's intent to threaten violence. "We should draw only *reasonable* inferences in favor of the prosecution; we should not make random speculations in favor of the prosecution." (Emphasis in original.) *Id.* Additionally, like the public defender in *Dye* who was "scared, trembling, and on the verge of tears," Gill was also described as tearful and hysterical. However, as was done by the court in *Dye*, we consider the victim's reaction and impression of the defendant in context of the totality of the circumstances and do not find that Gill's reaction to defendant is an appropriate source from which to infer defendant's intent.

¶ 52    We further find it significant that defendant complied when Chessick asked him to step back from the office door and complied when Deputy Glover asked him to return to the courtroom after he finished his phone call. This indicates that defendant was not seriously expressing an intent to commit an act of unlawful violence against Gill. See *Black*, 538 U.S. at 359-60. Further, although Gill testified that she did not feel she could leave the office, she also testified she never tried, even though two law clerks had come into and gone out of the office while she was in there. The totality of the evidence here did not satisfy the State's burden. It

- 17 -

would be purely speculative to infer that defendant intended to convey a threat of unlawful violence against Gill based on the evidence presented at trial. Rather, we agree with defendant that a reasonable inference could be drawn from defendant's statements and conduct that he was angry about what Gill had said to him in the courtroom, wanted to find out her name so that he could file a complaint, and wanted her to come out of the office to provide him with her information. While we would characterize defendant's conduct as "distasteful, inept, and crude," as in *Dye*, we also view such conduct as "not criminal." See *Wood*, 2017 IL App (1st) 143135, ¶ 22.

¶ 53    Although the State's closing argument is not raised as an issue on appeal, we find that a comment made by the State indicates that it believed that it could meet its burden merely by proving that Gill felt threatened because of how defendant appeared to her or how she felt. In closing, the prosecutor stated that in order to convict defendant of threatening a public official, the jury had to find that "defendant knowingly delivered or conveyed directly or indirectly to a public official by any means a communication containing a threat that would place the public official in a reasonable apprehension of immediate or future bodily harm, confinement, or restraint." The State went on to explain as follows:

> "Directly or indirectly; it doesn't have to be direct. It doesn't have to be specific. [Defendant] didn't have to tell [Gill] I'm going to hurt you. I am going to confine you. I'm going to restrain you. He doesn't have to use those words at all. He doesn't have to use words, period. A menacing look, a gesture is enough."

The defense then made an objection, which was overruled. The State continued with the following example:

> "The boogie man is walking down the street on the same side you are on and you see him and just his mere presence scares you, just his mere presence, the way he positioned his body, any gestures he may make, the look in his eyes towards you which causes you to cross the street, that is an indirect threat."

¶ 54    While we agree that there are no magic words that indicate a defendant's intent to convey a threat, we believe this example by the State exemplifies why no rational trier of fact could have properly found defendant guilty based on the facts of this case. Neither the case that the State presented, nor the example given in its closing argument, represents a threat outside the protection of the first amendment because neither contains an indication that defendant (or the boogie man, in the example) meant to communicate a serious expression of an intent to commit an act of unlawful violence. See *Black*, 538 U.S. at 359-60. Simply put, the State's evidence and closing argument improperly focused on defendant's conduct solely from the perspective of the victim. Here, there was no evidence of defendant's intent to threaten Gill with violence, and as such, the State cannot meet its burden. Although there was testimony that defendant stood outside the state's attorney's satellite office for a number of minutes, continued to yell, and paced back and forth, without more, it is not rational to infer defendant's intent to commit violence. For example, there is no evidence that defendant actually attempted to enter the satellite office or that he tried to pull the door open while Gill was inside. There was no evidence that defendant made overtly threatening gestures while Gill was in the office or that he intended to do anything but obtain Gill's name. Additionally, some of the witnesses felt safe enough to go into the office and come out during the time that defendant was standing outside the door. During this time, defendant continued to ask for Gill's name and asked that she come out of the office and provide it to him. Based on this conduct, no rational trier of fact could

- 18 -

have inferred defendant intended to commit an act of violence against Gill. Because "we interpret section 12-9 as requiring intentionality" (*Dye*, 2015 IL App (4th) 130799, ¶ 10), the State was required to prove defendant's intent to convey a threat of unlawful violence beyond a reasonable doubt, but failed to do so. As such, we reverse defendant's conviction for threatening a public official. Because we reverse defendant's conviction for threatening a public official due to insufficiency of the evidence, we need not address his alternative argument for reversal—that his counsel provided ineffective assistance.

¶ 55                    B. Constitutionality of Threatening a Public Official Statute

¶ 56    Defendant argues that the threatening a public official statute is unconstitutional because it violates guarantees of due process and free speech. Although not raised in the court below, "a constitutional challenge to a statute can be raised at any time." *People v. Bryant*, 128 Ill. 2d 448, 454 (1989). However, our supreme court has long recognized that " 'cases should be decided on nonconstitutional grounds whenever possible, reaching constitutional issues only as a last resort.' " *The Carle Foundation v. Cunningham Township*, 2017 IL 120427, ¶ 34 (quoting *In re E.H.*, 224 Ill. 2d 172, 178 (2006)). As a result, " 'courts *** must avoid reaching constitutional issues when a case can be decided on other, nonconstitutional grounds,' and such issues 'should be addressed only if necessary to decide a case.' " *Id.* (quoting *People v. Hampton*, 225 Ill. 2d 238, 244 (2007)). Because we have already determined that the State failed to prove defendant guilty of threatening a public official beyond a reasonable doubt, we need not address his constitutional challenges.

¶ 57                    C. Sufficiency of the Evidence for Unlawful Restraint

¶ 58    Defendant also asserts that his unlawful restraint conviction, which the trial court merged into his conviction for threatening a public official and did not impose sentence upon, should be reversed because his speech, which was directed to a public official, cannot be categorized as "fighting words" that conveyed a "true threat," and thus his speech was protected by the first amendment. "In a criminal case, there is no final judgment until the sentence has been imposed, and in the absence of a final judgment, an appeal cannot be entertained except as specified in Illinois Supreme Court Rule 604 (210 Ill. 2d R. 604)." *People v. Thomas*, 402 Ill. App. 3d 1129, 1131 (2010). Illinois Supreme Court Rule 604 (eff. Dec. 3, 2015) provides exceptions for appeals from certain judgments and orders, including appeals by the State; appeals when a defendant is placed under supervision or sentenced to probation, conditional discharge, or periodic imprisonment; appeals from bail orders by a defendant before conviction; appeals by a defendant from a judgment entered upon a guilty plea; appeals from an order finding a defendant unfit to stand trial or be sentenced; appeals by a defendant on grounds of former jeopardy; and appeals from an order granting a motion to disqualify defense counsel. None of these exceptions apply here.

¶ 59    However, our supreme court has recognized other scenarios in which an appellate court has jurisdiction to address unsentenced convictions. In *People v. Dixon*, 91 Ill. 2d 346, 349 (1982), the defendant was convicted of armed violence, aggravated battery, mob action, and disorderly conduct. The circuit court sentenced the defendant to two concurrent four-year terms on the armed violence and aggravated battery convictions and did not impose sentence on the mob violence and disorderly conduct convictions, holding that they merged into the sentenced convictions. *Id.* The appellate court affirmed the aggravated battery conviction, reversed the

- 19 -

armed violence conviction, and refused to remand for sentencing on the two unsentenced convictions. *Id.* On appeal to the supreme court, the State argued that the appellate court should have remanded the cause to impose a sentence on the defendant's conviction for mob action or disorderly conduct, as the State conceded that the defendant could not be sentenced on both. *Id.* at 351. The defendant responded that the appellate court did not have jurisdiction to entertain an appeal from the State from a nonfinal order where the defendant did not raise any issues concerning its propriety. *Id.*

¶ 60    In reaching its decision, our supreme court noted that "the final step in a criminal judgment is the sentence [citations], and that in its absence an appeal ordinarily cannot be entertained because the judgment is not final [citations]." *Id.* at 352. The court explained that there were cases similar to the one at bar where action by the reviewing court was not precluded. *Id.* (citing *People v. Lilly*, 56 Ill. 2d 493 (1974), and *People v. Scott*, 69 Ill. 2d 85 (1977)). The court further stated that the issue before it differed from those cases because the defendant had not appealed from the mob action and disorderly conduct convictions. *Id.* at 353. The defendant, therefore, argued that if the court allowed the case to be remanded to impose a sentence on those counts, it would effectively broaden the right of the State to appeal. *Id.* The supreme court rejected the defendant's argument and held that the matter should be remanded to the circuit court to impose a sentence on the defendant's mob action conviction, determining that "[t]he situation before us is an anomalous one in that the trial judge's failure to impose sentence on defendant's convictions for mob violence and disorderly conduct stemmed from his belief that they merged into the other offenses upon which he did not impose sentence." *Id.* The court ultimately held that although the unsentenced convictions were nonfinal orders, the appellate court had jurisdiction to order remand to impose a sentence because the defendant had appealed the final judgments entered on the sentenced convictions and because the unsentenced convictions were "intimately related to and 'dependent upon' the appealed convictions within the meaning of Rule 615(b)(2)." *Id.* at 353-54.

¶ 61    In *People v. Relerford*, 2017 IL 121094, our supreme court recently reexamined the application of *Dixon*. In *Relerford*, 2017 IL 121094, ¶ 14, the defendant was convicted of four counts—two counts of stalking and two counts of cyberstalking—but was only sentenced on one stalking count. The circuit court did not impose a sentence on the three remaining convictions, and the record on appeal did not disclose why. *Id.* The appellate court vacated all four of the defendant's convictions based on its determination that the stalking and cyberstalking statutes violated due process. *Id.* ¶ 15. The supreme court disagreed with the appellate court's reasoning (*id.* ¶ 22), but ultimately affirmed its decision to vacate defendant's convictions on other grounds (*id.* ¶ 78). As a final matter, the supreme court addressed the appellate court's decision to address the validity of the defendant's three unsentenced convictions. *Id.* ¶ 71. The court noted that the appellate court determined that it had jurisdiction to address those convictions based on *Dixon*, and found "the appellate court's conclusion to be unwarranted under the circumstances of this case." *Id.* The court stated that the appellate court's reliance on *Dixon* was misplaced for two reasons. First, the court found *Dixon* distinguishable on its facts because *Dixon* was " 'anomalous' " in that "the circuit court determined, albeit incorrectly, that sentences could not be imposed on the lesser offenses because they merged into the other offenses." *Id.* ¶ 74. Our supreme court then made clear its view that "the decision in *Dixon* must be understood to be limited to the type of factual situation presented in that case," which it stated did not exist in the case before it. *Id.* Second,

the court stated that *Dixon* must be given a narrower interpretation than the one given by the appellate court because "[a] close reading of *Dixon* makes clear that, to the extent the appellate court had any jurisdiction to address the nonfinal convictions, that jurisdiction was limited to ordering a remand for imposition of sentences on the lesser convictions." *Id.* ¶ 75. As a result, the court held that the appellate court had interpreted *Dixon* too broadly and had improperly considered the merits of the defendant's unsentenced convictions. *Id.* Ultimately, however, the supreme court exercised its general administrative and supervisory authority to obtain jurisdiction over the unsentenced counts. *Id.* ¶ 76.

¶ 62        Although defendant was not sentenced on the unlawful restraint count, he nonetheless argues that this court should reverse that conviction. In this case, it is clear that the trial court did not impose a sentence on the unlawful restraint count because it merged that conviction into defendant's conviction for threatening a public official and imposed a two-and-a-half year prison sentence on the threatening a public official count. It is unclear why the court merged those two convictions. Defendant states in his reply brief that "the record shows the trial court erroneously merged the unlawful restraint conviction into the threatening a public official conviction," but provides no explanation or legal authority to explain why the merger was erroneous. Instead, defendant argues that our substantive review is permitted because an erroneous merger occurred here as it did in *Dixon*.

¶ 63        Defendant acknowledges *Relerford*, but suggests that the court there "held the appellate court should not have addressed the validity of the defendant's unsentenced convictions because the record did not disclose the reason for the trial court's failure to impose sentences on those counts." We agree with defendant that the factual scenario in this case is similar to that of *Dixon* and thus may satisfy the first part of the *Relerford* holding that requires an appellate court's jurisdiction to review unsentenced convictions be limited to cases factually similar to *Dixon*. However, we disagree with defendant's interpretation of *Relerford* because defendant ignores the second portion of the *Relerford* holding, wherein the court stated that even when a factual scenario similar to *Dixon* existed and thus an appellate court had jurisdiction, "that jurisdiction was limited to ordering a remand for imposition of sentences on the lesser conviction." *Id.* ¶ 75. Here, it is possible that the circuit court improperly merged counts as in *Dixon*, but even assuming that the merger was improper, we would still not have jurisdiction to review the merits of defendant's unlawful restraint conviction based on the court's holding in *Relerford*. As a result, because defendant has included his unlawful restraint count in his notice of appeal, we exercise our limited jurisdiction to remand this matter to the circuit court to impose a sentence on defendant's unlawful restraint count. See *People v. Olaska*, 2017 IL App (2d) 150567, ¶ 115 ("[R]egardless of what authority this court has with respect to unsentenced convictions, we have no jurisdiction to review convictions that defendant has not in fact appealed.").

¶ 64                                          III. CONCLUSION

¶ 65        Based on the foregoing, we reverse defendant's conviction for threatening a public official because the State failed to prove defendant guilty beyond a reasonable doubt. We also remand this matter to the circuit court to impose a sentence on defendant's unlawful restraint conviction because we lack jurisdiction to address the merits of defendant's appeal of that issue.

¶ 66      Reversed and remanded with directions.